Filed 11/29/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RENEE THOMAS,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>        Defendants and Respondents. | A164550<br><br>(Alameda County<br>Super. Ct. No. RG20073375) |

Renee Thomas was recruited to play on the women's soccer team at the University of California, Berkeley (UCB), played on the team during her freshman year and, in the spring of that year, was released from the team. She sued UCB, the head coach of the women's soccer team, and the Director of Athletics (collectively, defendants), first in federal court and then in state court. The present appeal is from the judgment in favor of the defendants entered after the trial court sustained demurrers to all Thomas's causes of action without leave to amend. As we will explain, we conclude Thomas sufficiently pleaded a cause of action for sexual harassment in violation of Civil Code section 51.9 against the head coach and UCB and should have been granted leave to amend her complaint to clarify the statutory basis of this claim. In all other respects, we will affirm the trial court's decision.

1

## BACKGROUND

### I.

### *Factual Background*

The following is the factual background as alleged in Thomas's first and second amended complaints.

Thomas is a "well-regarded soccer player" who was recruited by head coach Neil McGuire to play in the 2018-2019 season. McGuire knew at the time that Thomas had already committed to play for the University of Colorado, which had offered her a scholarship. At a meeting with Thomas and her mother in February 2018, McGuire "assured" Thomas that she would be on UCB's women's soccer team for four years. McGuire told Thomas she was "the missing piece that their staff had overlooked during recruitment that year" and he "diagrammed for her and her mother the ways in which he would utilize a player like her." McGuire knew at the time that he had "allowed women who were not qualified athletes to become part of the team, which would put [Thomas's] spot on the team in jeopardy," and that factors beyond her performance and compliance with the program's expectations "would impact her continued status as a team member." He failed to disclose that Thomas "could be removed from the team for reasons beyond her failure to play competently and in accordance with his instructions and meet his standards of behavior." McGuire represented that he was "a coach who was kind and encouraging and who valued his athletes for both their athletic and their academic dedication," and "intentionally" kept from Thomas that his coaching style "included hostile berating of young women, inquiry into their sex lives, and psychological abuse." McGuire had become "enraged with

women athletes and behaved erratically and abusively towards his team in documented incidents since at least 2009."

Thomas turned down her scholarship to the University of Colorado to accept a non-scholarship spot on UCB's team based on McGuire's "assurances that she was joining a four-year soccer program, that she would play on the team as long as she met the reasonable performance expectations of the program, and that she would be coached in a caring and encouraging manner." She reasonably relied on McGuire's representation that "nothing outside of her performance and her compliance with the expectations of the program would result in her dismissal," and she had "every reason to trust" McGuire would keep his commitment since "[p]layers are not commonly released from University-level athletic teams" and "there is no external limit on team size for the women's soccer team, so even under-performing players do not need to be released to create room for other, stronger performers." McGuire's failure to disclose that factors beyond Thomas's performance and compliance with the program's expectations "would impact her continued status as a team member" induced her to join the team "at the expense of her commitment to the University of Colorado or any other program in which she could have participated."

Thomas joined the team as one of six non-scholarship players, performed well, complied with the expectations McGuire laid out for her and "participated in every opportunity available to her to improve her performance."[1] McGuire told her she was "promising enough to rival the

---

[1] Thomas alleged that she played 304 minutes during the 2018-2019 season, which was "far more than any other non-scholarship freshman that year" and "more than several of her upper classmen teammates," and of 29 offensive players on the team, "ranked 20th in playing time and tied for eighth in points for goals and assists."

3

best-performing forward on the team" and she was honored at the team's annual banquet as the most improved player. In the spring of 2019, McGuire instructed Thomas to show potential recruits around campus and told her a new recruit would be her teammate the next year, which reassured Thomas "that she had performed well, was still a valued member of the team, and could look forward to playing during the 2019-2020 season."

During the 2018-2019 season, Thomas "experienced and witnessed" abusive behavior by McGuire. McGuire lost his temper at the athletes "on many occasions," "[i]n fits of rage, he singled out athletes and berated them in front of the team, sometimes nonsensically, to make an example of them and strike fear in the witnessing athletes," he "called young female athletes names, cursed at them, and degraded them with personal insults both related and unrelated to athletic performance," and he "tormented them psychologically and punished them with grueling workouts." His "behavior was described to [UCB's] athletics administration as creating a culture of fear and intimidation."

Thomas was present for "tirades" in which McGuire "degraded the entire team." He "belittled the physique of one player in front of the team and called her 'weak' despite her compliance with the training program," "made unwelcome and inappropriate comments about players' bodies," and "berated a young woman for having what he perceived as a hickey on her neck." He "tormented the athletes psychologically" and on one occasion told them they "needed to perform better or his children and the children of other coaches would suffer." Once, after a pre-season loss, "without provocation," McGuire stopped practice to yell at Thomas in front of the team, then kicked her off the field and told her she did not belong in the program; on another occasion, he "berated" her for not being disciplined "despite her commitment

4

at practices and her initiative to perform supervised drills after practice." His "outbursts" made Thomas feel she had to be "absolutely perfect" and "any error would cause him to turn his back on her." She and others would try to "tread extremely lightly" around McGuire "to avoid drawing his anger or retaliation," which caused them "extreme stress and anxiety."

Players and their parents complained about McGuire's conduct to Jim Knowlton, UCB's Athletic Director, and other administrators. In March 2018, McGuire's assistant athletic trainer made a complaint about his behavior in "physically and psychologically abus[ing] his team following what he perceived as a moment of disrespect." In 2019, the mother of a women's soccer team player documented "the abuses suffered by her daughter and other female athletes" in a lengthy letter to Knowlton's "second in command," Jennifer Simon-O'Neill, and subsequently attempted to meet with the UCB Chancellor, but was ultimately told by Knowlton that the complaints were "not validated." In April 2019, three women's soccer team players met with Knowlton and Simon-O'Neill and were told "there was nothing they could say that would result in [McGuire's] termination." In December 2019, the Office for the Prevention of Harassment and Discrimination (OPHD) reported a complaint by a UCB employee regarding McGuire's "harassment of his players," which "confirmed that McGuire's inappropriate comments about young women's bodies and about 'hickeys' on the young women's necks had been reported to them"; the subject player was offered support services, but nothing was done to intervene with McGuire. Knowlton and other athletic department administrators "disregarded and ignored" athletes' complaints and allowed McGuire to "continue his ill treatment," causing Thomas and other athletes "extreme despair."

5

On April 29, 2019, "without warning or explanation," McGuire released Thomas and four others from the team. It was "rare" for McGuire to release players from the team and "quite unusual that he released five players at once."

This occurred "just after the public exposure of the national admissions scandal that was discovered to have exploited athletic teams at prestigious universities to enroll students who lacked the athletic skills to achieve enrollment to the universities as student athletes." A player on the women's soccer team "recalled two young women from two years prior who were recruited to the women's soccer team, admitted to the university because of their recruitment as student athletes, but who did not play," and she reported her suspicions that this related to the scandal to the Federal Bureau of Investigation. In 2020, the State Auditor of California (Auditor) released a report concluding that UCB had "wrongfully admitted students using athletic teams as the point of entry."

## II.

### *Legal Proceedings*

#### A. Federal Action

Thomas initially filed a complaint in federal court alleging disparate treatment of the UCB men's and women's soccer teams in violation of United States Code title IX (20 U.S.C. § 1681 et seq.) (Title IX) and California Education Code section 66271.8, gender discrimination in violation of the Unruh Civil Rights Act (Civ. Code, § 51) (Unruh Act), and negligence and negligent infliction of emotional distress, all based on her unjustifiable release from the team. The disparate treatment claims were based on allegations that only one player was released from the men's soccer team that spring and Thomas and others on the women's soccer team "were treated

6

unfairly when compared with their male counterparts"; it did not include any allegations concerning McGuire's abusive treatment.

After the district court dismissed the complaint with leave to amend three of the causes of action,[2] Thomas filed a first amended complaint again alleging Title IX, Unruh Act and negligence claims and adding a new claim against McGuire for breach of fiduciary duty. Thomas added factual allegations describing abusive conduct by McGuire, complaints by players and parents and failure to intervene by Knowlton and UCB as detailed in the background facts above, as well as further allegations related to the Title IX claim that are not relevant to the present case.

The district court dismissed the first amended complaint without leave to amend, finding Thomas failed to state any of her claims and leave to amend would be futile. The court subsequently amended its order to decline supplemental jurisdiction over the state law claims after Thomas asked it to reconsider the dismissal of her state claims with prejudice so as to allow her to pursue the claims in state court.

**B. The Present Case**

**1. *Complaint and First Amended Complaint***

Thomas filed her complaint in superior court on September 11, 2020, alleging claims against McGuire and Knowlton for violation of the Unruh Act and negligence, and against McGuire for breach of fiduciary duty and fraud. She subsequently filed a first amended complaint adding that UCB was liable pursuant to Government Code section 815.2. The defendants demurred.

The trial court sustained the demurrer with leave to amend only the fraud claim against McGuire. The court held that Thomas failed to state

---

[2] Thomas conceded she could not state the claims for violation of Education Code section 66271.8 and negligent infliction of emotional distress.

7

causes of action for violation of the Unruh Act or Civil Code section 51.9 (which Thomas argued was actually the basis for her Unruh Act claim), negligence or breach of fiduciary duty, and that the fraud claim against UCB was barred by governmental immunity (Gov. Code, § 818.8 [public entity not liable for employee's misrepresentation]). Explaining its denial of leave to amend these claims, the court stated, "Between this action and the prior federal action, plaintiff has had four opportunities to attempt to allege any specific facts in support of her claims. Although plaintiff's opposition requests further leave to amend, plaintiff has not identified any additional facts she would allege if permitted to do so. The court infers that plaintiff has pleaded her case to best advantage and that further leave to amend the first through third causes of action would be futile." The court found the cause of action for fraud against McGuire uncertain and granted Thomas leave to amend.[3]

Thomas's second amended complaint, filed on July 6, 2021, added to her fraud claim allegations that McGuire "knew that the statements he made to induce [her] to join the team were false at the time that he made them," "had a duty to disclose this information to [her] because he was actively concealing the information," "made partial disclosures to induce her attendance" and "had exclusive knowledge of the facts he was concealing." Thomas also added a new claim of negligent misrepresentation (Civ. Code,

---

[3] The court noted that Thomas did not allege what McGuire said to provide the alleged assurance that she would remain on the team if she performed well, or when it was said; that later in the complaint she appeared to base her claim on an "omission" theory; and that in her federal complaint had alleged an " 'implicit' promise" that she would remain on the team throughout her undergraduate program.

8

§ 1710(2)) based on the same allegations (minus the allegation that McGuire knew the statements were false at the time he made them).

McGuire demurred and moved to strike the misrepresentation claim as well as certain "immaterial allegations" and the prayers for injunctive relief (reinstatement), attorney fees and punitive damages.

### 2. *The Court's Ruling*

On December 9, 2021, the trial court adopted its tentative ruling sustaining the demurrer without leave to amend, finding that Thomas failed to allege all the required elements of a cause of action for fraud and McGuire was entitled to public employee misrepresentation immunity (Gov. Code, § 822.2). The court stated that it had not authorized Thomas to add a new claim of negligent misrepresentation, and, in any case, Government Code section 822.2 would apply to this claim as well. Accordingly, the court sustained the demurrer to both claims without leave to amend and dropped the motion to strike as moot.

The court filed its judgment on January 25, 2022. Thomas filed a timely notice of appeal on February 16, 2022.

### DISCUSSION

### I.

### *Standard of Review*

"A demurrer is properly sustained when '[t]he pleading does not state facts sufficient to constitute a cause of action.' (Code Civ. Proc., § 430.10, subd. (e).) On appeal, a resulting judgment of dismissal is reviewed independently. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) ' " '[W]e accept as true all the material allegations of the complaint' " ' (*Korea Supply [Co. v. Lockheed Martin Corp.* (2003)] 29 Cal.4th [1134,] 1141), but do not 'assume the truth of contentions, deductions or conclusions of law' (*Aubry*

9

*v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967).” (*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512.) “We liberally construe the pleading with a view to substantial justice between the parties.” (*Tepper v. Wilkins* (2017) 10 Cal.App.5th 1198, 1203; Code Civ. Proc., § 452.) “If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer.” (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.)

“When a demurrer is sustained without leave to amend, it is the duty of the reviewing court to decide whether there is a reasonable possibility that the defect can be cured by amendment. If it can, the trial court has abused its discretion and we must reverse. If it cannot be reasonably cured, there has been no abuse of discretion. [Citation.] It is the plaintiff’s burden to show the reviewing court how the complaint can be amended to state a cause of action. [Citation.]” (*Michaelian v. State Comp. Ins. Fund* (1996) 50 Cal.App.4th 1093, 1105.)

## II.

### *The First Amended Complaint Stated a Cause of Action for Sexual Harassment.*

#### A. Background

The first cause of action in Thomas’s first amended complaint alleged violation of the Unruh Act. Civil Code section 51, provides: “All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.” (Civ. Code, § 51, subd. (b).)

Thomas alleged that McGuire and Knowlton "engaged in unreasonable, arbitrary, and invidious discrimination" against her and "denied her full and equal privileges as compared with male athletes"; her gender was a "substantial motivating reason" for McGuire's and Knowlton's conduct; and UCB was liable for unlawful actions of its employees under Government Code section 815.2. The defendants' demurrer argued Thomas could not establish this claim because, among other reasons, UCB is not a " 'business establishment' covered by the Unruh Act."

In her opposition, Thomas argued that "[t]he Unruh Act also prohibits sexual harassment," citing Civil Code section 51.9. As relevant here, Civil Code section 51.9 provides: "(a) A person is liable in a cause of action for sexual harassment under this section when the plaintiff proves all of the following elements: [¶] (1) There is a business, service, or professional relationship between the plaintiff and defendant . . . . [¶] (2) The defendant has made sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe. [¶] (3) The plaintiff has suffered or will suffer economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right, as a result of the conduct described in paragraph (2)." The non-exclusive list of "business, service, or professional" relationships to which the statute applies includes "teacher" and "[a] relationship that is substantially similar to any of the above." (Civ. Code, § 51.9, subd. (a)(1)(E) & (a)(1)(I).)

Civil Code section 51.9 is not part of the Unruh Act; it is a separate civil rights statute. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1044, fn. 1

11

(*Hughes*); *Ramirez v. Wong* (2010) 188 Cal.App.4th 1480, 1487, fn. 5.)[4]

Defendants challenged Thomas's "attempt[] to plead an entirely new claim" under a different statute than the one she actually pleaded as well as the sufficiency of her allegations. The trial court's ruling addressed both the Unruh Act and Civil Code section 51.9, finding Thomas's allegations insufficient under both.[5]

---

[4] *Hughes* explained that "Civil Code section 51.9 has sometimes been described as being part of the Unruh Civil Rights Act, presumably because of that statute's close proximity in the Civil Code to the Unruh Civil Rights Act, which appears in section 51 of the Civil Code. (See *Brown v. Smith* (1997) 55 Cal.App.4th 767, 774-775.) But Civil Code section 51 is the only statute comprising the Unruh Civil Rights Act. As that statute states, '*This section* shall be known, and may be cited, as the Unruh Civil Rights Act.' (Civ. Code, § 51, italics added; see *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 757.)"

[5] The trial court held Thomas could not establish a claim under the Unruh Act because she alleged only conduct arising from the UCB athletics program and UCB is not a business establishment under Civil Code section 51, and because she did not allege "any specific facts showing discrimination was the reason for her release from the team." For the first point, the court relied on *Brennon B. v. Superior Court* (2020) 57 Cal.App.5th 367, which held that a public school district is not a "business establishment" under the Unruh Act and has since been affirmed by the California Supreme Court. (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662.) As to the second point, the court explained that Thomas provided no basis for comparing McGuire's decision to release five players from the women's soccer team with the decision of the men's team coach to release only one player or for the allegation that Knowlton "discriminated on the basis of gender because he did not terminate McGuire following complaints by other players and parents and, on information and belief, 'the University would not have ignored and disregarded complaints of misconduct made by male athletes.' "

The court then noted that Thomas did not specifically allege a claim under Civil Code section 51.9 but, if she had, it would fail because she did not sufficiently allege the necessary pervasive or severe conduct. The court discussed the federal district court's evaluation of the same allegations and

As in the trial court, on this appeal Thomas does not argue she can state a cause of action under Civil Code section 51. The question whether UCB is a business establishment within the meaning of the Unruh Act is therefore irrelevant to our consideration of the case.[6] Neither the defendants nor the trial court appear to have questioned the existence of the "business, service or professional" relationship required for a Civil Code section 51.9 claim. Accordingly, the issues before us are whether Thomas alleged the type of conduct described in Civil Code section 51.9 and, if not, would be able to amend her complaint to cure the deficiencies.

## B. Analysis

### 1. *Governing Principles of Substantive Law*

As noted, a plaintiff claiming sexual harassment in violation of Civil Code section 51.9 must show that the defendant "made sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe." *Hughes, supra,* 46 Cal.4th at pages 1044 and 1048, explained that

---

agreed with its conclusion that certain allegations were conclusory while others were "not sexual in nature" or "did not suggest an inference of sex based harassment." Contrary to Thomas's assertion, the trial court did not "improperly read into [Civil Code] section 51.9 a requirement that defendants be a 'business establishment' as defined by [Civil Code] section 51." The trial court discussed the business establishment requirement only in its analysis of Thomas's claim as pleaded under Civil Code section 51 and addressed Civil Code section 51.9 separately.

[6] Thomas argues in her opening brief that she could plead and prove UCB is a business establishment if required to do so, due to distinctions between universities and public school districts. Her primary argument, however, is that her claim is under Civil Code section 51.9, which does not require that the defendant be a business establishment.

13

when it was enacted in 1994, "the Legislature intended to conform Civil Code section 51.9 to the California and federal laws pertaining to sexual harassment in the workplace," Title VII of the federal Civil Rights Act of 1964 (Title VII) and California's Fair Employment and Housing Act. It is therefore appropriate to find guidance in "the holdings and reasoning of court decisions dealing with sexual harassment in the workplace" in determining whether a plaintiff has "a viable cause of action under [Civil Code] section 51.9, which applies to professional relationships outside the workplace." (*Hughes,* at p. 1048.)

As developed in the employment context, federal and state law generally recognizes " 'two theories of liability for sexual harassment claims . . . " . . . quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances . . . [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment." ' " (*Hughes, supra,* 46 Cal.4th at p. 1043.) The present case involves the "hostile environment form of sexual harassment." (*Id.* at p. 1048.)

"[T]he existence of a hostile . . . environment depends upon 'the totality of the circumstances.' " (*Hughes, supra,* 46 Cal.4th at p. 1044, quoting *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.) " '[T]o be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive." ' " (*Hughes, supra,* 46 Cal.4th at p. 1044, quoting *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 284 (*Lyle*).) The sexually harassing conduct must be " 'pervasive or severe.' " (*Hughes,* at p. 1044.) "To be *pervasive,* the sexually harassing conduct must consist of 'more than a few isolated incidents' "; it must be "so egregious as to

14

alter the conditions of the underlying professional relationship." (*Id.* at p. 1048.) "[A]n isolated incident of harassing conduct may qualify as 'severe' when it consists of 'a *physical* assault or the threat thereof.' " (*Id.* at p. 1049.)

In the employment context, " '[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended. [Citation.] [¶] The factors that can be considered in evaluating the totality of the circumstances are: (1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred.' " (*Singleton v. United States Gypsum Co.* (2006) 140 Cal.App.4th 1547, 1557, quoting *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609-610 (*Fisher*).)

"The plaintiff must show that the harassing conduct took place because of the plaintiff's sex, but need not show that the conduct was motivated by sexual desire. (*Singleton v. United States Gypsum Co.* [*supra,*] 140 Cal.App.4th [at p.] 1564; see also *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 80 [same principle applies under title VII].)" (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 114 (*Pantoja*).) "Sexual harassment does not necessarily involve sexual conduct. It need not have anything to do with lewd acts, double entendres or sexual advances. Sexual harassment may involve conduct, whether blatant or subtle, that discriminates against a person solely because of that person's sex." (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 345 (*Accardi*).) "For example, a female plaintiff can prevail by showing that the harassment was because of the defendant's bias

15

against women" or that an employer created a hostile work environment "because the employer feels important or powerful while humiliating women." (*Pantoja,* at pp. 114-115.) Harassment "because of sex" may be shown where "an abusive bully takes advantage of a traditionally female workplace because he is more comfortable when bullying women than when bullying men." (*E.E.O.C. v. National Educ. Ass'n, Alaska* (9th Cir. 2005) 422 F.3d 840, 845 (*E.E.O.C.*).) To plead a cause of action for sexual harassment in the form of a hostile environment, "it is 'only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff "had been a man she would not have been treated in the same manner." ' [Citation.]" (*Tomkins v. Public Serv. Elec. & Gas Co.* (3d Cir.1977) 568 F.2d 1044, 1047, fn. 4.)" (*Accardi,* at p. 348.)

In *Accardi*, for example, some allegations were overtly sexual, but many were neither explicitly sexual nor explicitly gendered. The misconduct plaintiff alleged included, among other things, "spreading untrue rumors about her abilities, deliberately singling her out for unfavorable work assignments and work shifts, making unsubstantiated complaints about her performance, . . . stuffing her shotgun barrels with paper so that the weapon would explode if fired, . . . and threatening to disrupt her wedding." (*Accardi*, *supra,* 17 Cal.App.4th at p. 346.) The court disagreed with an argument that allegations concerning "a disputed workers' compensation claim, job assignments, and disability claims" did not relate to sexual harassment, finding the argument "too narrowly define[s] the scope of Accardi's sexual harassment claim" as "[t]he gist of [the] complaint is that the [police department] waged a decade-long campaign against her" due to the department's "unwritten policy that law enforcement has traditionally been 'a man's job' and, hence, 'no women need apply.' " (*Id.* at pp. 349-350.)

16

Defendants attempt to distinguish *Accardi* on the basis that it is an employment case and does not mention Civil Code section 51.9.  Civil Code section 51.9 was enacted in 1994, the year *after Accardi* was decided.  Further, while section 51.9 originally covered only sexual conduct (see Stats. 1994, ch. 710 [§ 51.9, subd. (a)(2)] ["sexual advances, solicitations, sexual requests, or demands for sexual compliance"]), it was amended in 1999 to expand the conduct covered to conform to the courts' interpretation of sexual harassment under the Fair Employment and Housing Act (FEHA).  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 519 (1999-2000 Reg. Sess.) as amended Sept. 9, 1999.)  The legislative history refers to "hostile environment sexual harassment."  (*Id.* at p. 5.) The *Accardi* decision interpreting FEHA was emblematic of that type of sexual harassment and was still recent when the legislation was amended.  Thus, the Legislature was presumptively aware of the *Accardi* definition when it added the language "other verbal, visual, or physical conduct of a sexual nature *or of a hostile nature* based upon gender" (italics added) to the definition of sexual harassment in section 51.9.  (*Gaetani v. Goss-Golden West Sheet Metal Profit Sharing Plan* (2000) 84 Cal.App.4th 1118, 1127.)

## 2. *Pleading Requirements and Demurrers*

A complaint must contain "[a] statement of the facts constituting the cause of action, in ordinary and concise language."  (Code Civ. Proc., § 425.10, subd. (a)(1).)  "[T]he complaint ordinarily is sufficient if it alleges ultimate rather than evidentiary facts."  (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 550 (*Doe*).)  "However, distinguishing ' "[u]ltimate facts" ' from 'evidentiary' facts and ' "legal conclusion[s]" ' can be difficult.  (Weil & Brown, Cal. Practice Guide:  Civil Procedure Before Trial [(The Rutter Group, Edmon & Karnow ed. 2022)] ¶ 6:124, p. 6-38 [Weil & Brown]; see *Burks v. Poppy*

*Construction Co.* (1962) 57 Cal.2d 463, 473 ['distinction between conclusions of law and ultimate facts is not at all clear'].)  Generally, court and litigants are guided in making these distinctions by the principle that a plaintiff is required only to set forth the essential facts with ' " ' "particularity sufficient to acquaint a defendant with the nature, source and extent of [the plaintiff's] cause of action." ' " ' (*Doe*[,] at p. 550.)" (*Foster v. Sexton* (2021) 61 Cal.App.5th 998, 1027-1028 (*Foster*).)

"Under this doctrine of less particularity, less specificity is required in pleading matters of which the defendant has superior knowledge." (*Foster, supra,* 61 Cal.App.5th at p. 1028.)  "A plaintiff 'need not particularize matters "presumptively within the knowledge of the demurring" defendant. [Citation.]' [Citation.]" (*Elder v. Pacific Bell Telephone Co.* (2012) 205 Cal.App.4th 841, 858.)  This includes matters such as a defendant's knowledge or notice or intent.  (*Doe, supra,* 42 Cal.4th at pp. 549-550; Weil & Brown, *supra*, ¶ 6:121.5, p. 6-37.)  A complaint will be upheld " 'so long as the pleading gives notice of the issues sufficient to enable preparation of a defense.' [Citation.]" (*Doe,* at pp. 549-550; Weil & Brown, *supra*, ¶ 6:121.5, p. 6-37.)

"The scope of review for a general demurrer sustained without leave to amend is governed by established principles:  Our review is de novo.  We accept as true, and liberally construe, all properly pleaded allegations of material fact, as well those facts which may be implied or reasonably inferred from those allegations.  [Citation.]  Because such factual allegations 'however odd or improbable' [citation], are to be accepted, ' " 'the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court.' " ' [Citation.]  '[A]ny particular count which is well pleaded will not be affected by defects in a separate cause

18

of action, so long as inconsistent or antagonistic facts are not pled.' [Citation.]

"On the other hand, we do not accept contentions, deductions, or conclusions of fact or law. [Citation.] Similarly, although we permit some latitude to ' "the accuracy with which [the plaintiff] describes the defendant's conduct" ' [citation], we are not bound to respect a pleader's 'legal characterization' of events or transactions. [Citation.] Our sole consideration is an issue of law—whether the plaintiff's complaint is sufficient 'to state a cause of action under any legal theory.' [Citations.] Stated another way, the complaint 'survives a general demurrer insofar as its states, however inartfully, facts disclosing some right to relief.' [Citations.]" (*O'Grady v. Merchant Exchange Productions, Inc.* (2019) 41 Cal.App.5th 771, 776-777.)

### 3. *Thomas Sufficiently Pleaded Sexual Harassment by McGuire.*

The elements of a cause of action for sexual harassment under Civil Code section 51.9 are 1) a "business, service, or professional relationship between the plaintiff and defendant"; 2) the defendant "made sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender"; 3) the defendant's conduct was "unwelcome and pervasive or severe"; and 4) the plaintiff "has suffered or will suffer economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right, as a result of the [defendant's] conduct." (Civ. Code, § 51.9; CACI No. 3065.)

The parties dispute whether Thomas sufficiently alleged conduct of the required nature and pervasiveness or severity. In our view, she did.

As earlier explained, Thomas claims sexual harassment in the form of a hostile environment—that McGuire, in the words of Civil Code section 51.9, "engaged in . . . verbal, visual, or physical conduct . . . of a hostile nature based on gender" that was "unwelcome and pervasive or severe." She alleged that McGuire "berated" the players in front of the team "to make an example out of them and strike fear in the witnessing athletes"; called the players names, cursed at them and "degraded them with personal insults"; "tormented them psychologically"; "punished them with grueling workouts"; and was described to the UCB athletic administration as "creating a culture of fear and intimidation." This included making "unwelcome and inappropriate comments about players' bodies," "call[ing] out the physique of one player in front of the team and call[ing] her weak" and "berat[ing] a young woman for having what he perceived as a hickey on her neck." Thomas alleged that his conduct made her feel she had to be "absolutely perfect" and caused her and her teammates to "tread extremely lightly around [McGuire]" to "avoid drawing his aggression or being retaliated against." Team members and their parents complained to the athletics department and to the UCB Chancellor about the "abuse."

These allegations unquestionably describe pervasive bullying behavior toward the young women on the soccer team that created a hostile environment. The defendants argue (and the trial court concluded) that they do not allege pervasive *sexual* harassment because the alleged conduct and comments were not of a sexual or hostile gender-based nature. We disagree. As we have explained, "there is no legal requirement that hostile acts be overtly sex- or gender-specific in content, whether marked by language, by sex or gender stereotypes, or by sexual overtures." (*E.E.O.C., supra,* 422 F.3d at p. 844.) Even with no express reference to sex or gender, harassment

20

creating a hostile environment may constitute sexual harassment if the plaintiff can prove " ' "she would not have been treated in the same manner" ' " if she were a man.  (*Accardi, supra,* 17 Cal.App.4th at p. 348.)[7]

The required showing—"that the harassing conduct took place because of the plaintiff's sex" (*Pantoja, supra,* 198 Cal.App.4th at p. 114)—necessarily means "the defendant's discriminatory mental state is crucial."  (*Id.* at

---

[7] Our colleague contends that Senate amendments to Assembly Bill No. 519, which added the hostile environment form of sexual harassment to section 51.9, "changed the language to require that the wrongful acts of a hostile nature be *explicitly* 'based on gender.' " (Conc. & dis. opn. at p. 3, italics added.)  The Senate amendment did no such thing.  It added language to indicate that acts, whether of a sexual nature or of a hostile nature, must be "based on gender."  There is no indication this was intended as a departure from the interpretation of sexual harassment under FEHA and other sexual harassment laws as not requiring conduct or statements to explicitly reference sex or gender. (See discussion, *ante,* pp. 15-16.)  The legislation was designed to *conform* the definition of sexual harassment in section 51.9 to the interpretation of sexual harassment in FEHA cases, not to change that interpretation.  (See discussion, *ante,* p. 17.)

Our colleague also sets up a straw man, implying that if the conduct is not explicitly gender-based, then section 51.9 will be turned into a "general civility code" or means of "polic[ing] workplace insensitivity."  Besides trivializing the allegations of plaintiffs and other women athletes who have been treated especially harshly by coaches in a manner perceived as based on their gender, the argument misses the point.  A plaintiff must ultimately prove that the defendant's conduct was rooted in gender-based hostility or animus, for example, with evidence that the defendant exhibits a sense of power and importance when humiliating women or has chosen to coach females because he is more comfortable bullying women than men.  (*Accardi, supra,* 17 Cal.App.4th at p. 348.)  The burden of proving motivation and intent in a case like this one may ultimately be insurmountable.  But contrary to the dissent, it is not our position that conduct need not be sex- or gender-based to amount to actionable sexual harassment.  Rather, where we differ is in recognizing that ultimately the question is one of intent, which need not be alleged with particularity at the pleading stage.

21

p. 115.)  "[T]he plaintiff must show a discriminatory intent or motivation based on gender" (*id.* at p. 114), which often must be accomplished through circumstantial evidence and inferences rather than direct evidence.  (*Id.* at pp. 113; *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 283.)  This rule applies to sexual harassment cases.  As our Division One colleagues observed in *Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1525, "To prove sexual harassment, a plaintiff must show he or she suffered discrimination because of sex. . . . A FEHA plaintiff must show ' " 'that gender is a substantial factor in the discrimination, and that if the plaintiff "had been a man she would not have been treated in the same manner." ' " ' . . .  'Because proof of discriminatory intent often depends on inferences rather than on direct evidence, very little evidence of such intent is necessary to defeat summary judgment.' "

*E.E.O.C., supra,* 422 F.3d at page 844, provides one illustration.  In that case, the repeated "shouting, 'screaming,' foul language, invading employees' personal space . . . , and threatening physical gestures" on which the plaintiffs' sexual harassment claim was based "was not, on its face, sex- or gender-related."  (*Id.* at p. 844, fn. omitted.)  But there was evidence the behavior was more severe, more frequent and more threatening toward women than toward men and resulted in very different subjective effects—a factor deemed relevant in determining whether women and men were treated differently.  (*Id.* at pp. 845-846.)  *E.E.O.C.* held that "offensive conduct that is not facially sex-specific nonetheless may violate Title VII if there is sufficient circumstantial evidence of qualitative and quantitative differences in the harassment suffered by female and male employees."  (*Id.* at p. 842.)

The present case is not directly analogous; because McGuire was the coach of a women's team, Thomas did not allege facts suggesting any

22

disparity between *McGuire's* behavior toward women and his behavior toward men. This kind of disparate treatment in the context of a single-gender sport's team is necessarily more difficult to prove than in a mixed-gender workplace; McGuire was not the coach of the men's soccer team (or, as far as we know, any other men's sports team). But inability to compare the defendant's behavior toward women with his behavior toward men does not defeat a claim of sexual harassment. It simply requires that bias or discriminatory intent be established by some other route.

At the demurrer stage, Thomas was not required to prove anything, only to allege facts showing or supporting an inference of sexual harassment. Because the intent and motivation behind McGuire's boorish treatment of his student soccer players are uniquely within his knowledge, Thomas was not required to allege these matters with particularity. (*Doe, supra,* 42 Cal.4th at pp. 549-551; *Foster, supra,* 61 Cal.App.5th at p. 1028; *Elder v. Pacific Bell Telephone Co., supra,* 205 Cal.App.4th at p. 858.) At this stage, her allegations of pervasive on-going harassment, combined with the general allegation that gender was "[a] substantial motivating reason for [McGuire's] conduct" are sufficient.

Further, some of Thomas's allegations do support a reasonable inference that the harassment was based on gender, as they describe McGuire referring to players' sexual activity (berating a young woman for having a hickey on her neck) or making comments that implicate gender-based stereotypes and expectations (comments about young women's bodies; "calling out" a young woman's physique and calling her "weak").[8] Defendants

---

[8] It has been noted that "[a]thletics breed special opportunities for sexual harassment" in part because "[a]thletics appropriately entail much focus on athletes' bodies[,]" which can become "excessive." (Hogshead-Makar

23

(and the trial court), considering each of these allegations in isolation, dismissed them as not "sexual in nature" and not pervasive or severe. The conclusion that calling a player weak was not "of a sexual nature in the context of athletic coaching" was a factual determination that should have been made on the basis of whatever evidence Thomas eventually presented, not decided as a matter of law on demurrer. The trial court's description of Thomas alleging that McGuire "commented on players' bodies because he called a player 'weak'" inaccurately conflated an allegation of a single specific example ("[h]e called out the physique of one player in front of the team and called her weak") with an allegation of on-going behavior ("[h]e made unwelcome and inappropriate comments about players' bodies"), thereby minimizing the extent of the alleged conduct. The trial court dismissed Thomas's allegation that McGuire berated a player for having a hickey on her neck because Thomas did not allege she was present for the incident or aware of it while she was on the team, but Thomas addressed this point in her second amended complaint, which expressly alleged she was "present for this tirade."

Although most of Thomas's allegations describing harassment did not expressly refer to sex or gender, even a small number of gender-based actions or comments may cast light on unexpressed implications in or motives for other more gender-neutral harassment. The defendants' (and the trial court's) focus on specific allegations in isolation is contrary to the principle

---

& Steinbach, *Intercollegiate Athletics' Unique Environments for Sexual Harassment Claims: Balancing the Realities of Athletics with Preventing Potential Claims* (2003) 13 Marq. Sports L. Rev. 173, 175, 178.) Coaches inappropriately focusing on athletes' bodies, including weight, and " 'subject[ing] them to public ridicule about their diets and bodies' " have been noted as among the behaviors that may give rise to claims of sexual harassment. (*Id*. at pp. 178-179.)

24

that "the existence of a hostile . . . environment depends upon 'the totality of the circumstances.' " (*Hughes, supra*, 46 Cal.4th at p. 1044, quoting *Miller v. Department of Corrections, supra,* 36 Cal.4th at p. 462.)

Defendants further argue the allegations are insufficient because Thomas alleged only two incidents in which McGuire's behavior was specifically directed at her. But the fact that much of the harassment Thomas alleged was not directed at her individually does not undermine her hostile environment claim.

A plaintiff may be the victim of hostile environment sexual harassment " 'even though no offensive remarks or touchings are directed to or perpetrated upon' " her. (*Lyle, supra,* 38 Cal.4th at p. 284, quoting *Fisher, supra,* 214 Cal.App.3d at p. 610 and fn. 8.) *Lyle* explained that because "sexual conduct that involves or is aimed at persons other than the plaintiff is considered less offensive and severe than conduct that is directed at the plaintiff[,]" a hostile environment sexual harassment claim based on conduct not directed at the plaintiff requires the " 'higher showing' " that " 'the sexually harassing conduct permeated [her] direct work environment.' " (*Lyle,* at pp. 284-285, quoting *Fisher,* at p. 610.)

The first amended complaint satisfied this standard. It describes an environment permeated by McGuire's bullying and abusive conduct, with individual players berated in front of the whole team "to make an example of them and strike fear in the witnessing athletes," "creating a culture of fear and intimidation" in which Thomas and her teammates tried to "tread extremely lightly" to avoid "drawing [McGuire's] anger or retaliation." Thomas alleged that she "experienced and witnessed" McGuire's abusive behavior and "sat through tirades" in which McGuire's hostility was directed at the entire team as well as at individual players. In effect, she alleged a

25

hostile environment in which sexual harassment of individual young women on the team was intended to be, and was, perceived and experienced by all.[9] The only reasonable inference to be drawn from the allegations is that the behavior complained of was "a pattern of continuous, pervasive harassment[,]" not just "isolated instances[,]" and that it occurred in Thomas's presence. (*Fisher, supra,* 214 Cal.App.3d at p. 611.)[10]

The context of the present case is entirely different from a case like *Fisher,* in which the allegations of a hostile environment due to sexual harassment of women other than the plaintiff were insufficient to establish

[9] Thomas argues that the trial court erred in concluding her sexual harassment claim failed because she could not link her sexual harassment allegations with her release from the team. She maintains her release was only one type of harm she suffered and for purposes of her sexual harassment claim it was sufficient that she alleged suffering emotional distress. The trial court's ruling discussed Thomas's failure to allege facts showing discrimination was the reason for her release from the team in its analysis of her claim under section 51; it did not refer to this point in its separate analysis of sexual harassment under section 51.9.

[10] Singling out Thomas's allegation concerning McGuire's comment about a player having a hickey, defendants assert that *Fisher* "makes clear that unless Thomas was present for this alleged isolated incident, it is irrelevant." As we have said, Thomas alleged in her second amended complaint that she was present for the incident. In any event, as noted in *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 520, *Fisher* was addressing a situation where the plaintiff's claim was based entirely on conduct directed at others; *Beyda* disagreed with *Fisher* to the extent it could be "understood to require that a plaintiff personally witness any act relied upon to prove hostile environment." As *Beyda* explained, "a person can perceive, and be affected by, harassing conduct" in the relevant environment "by knowledge of that harassment" as well as by "personal observation." (*Beyda,* at p. 521.) Further, even if *not* known to the plaintiff, a defendant's harassment of others may be relevant to prove the defendant's intent or motive for conduct alleged to have created a hostile environment. (*Pantoja, supra,* 198 Cal.App.4th at pp. 114-116.)

"the nexus between the alleged acts and [the plaintiff's] work environment. (*Fisher, supra,* 214 Cal.App.3d at p. 614.) The plaintiff in *Fisher,* a surgical nurse, alleged the defendant doctor created a hostile work environment at the hospital where both worked by sexually harassing other women in her presence. (*Id.* at p. 612.) Although the complaint described what occurred in general terms, it did not indicate the "frequency or intensity" of the acts, such as whether each act the complaint described occurred once during the four-year period at issue or "on a daily or weekly basis" and whether, considering the specific work environment, the plaintiff observed them in passing or in circumstances where she was required to be present. (*Id.* at pp. 613-614.) Here, Thomas alleged sexual harassment in a team setting, directed at the entire team and at individual players in the presence of the team. While she did not specifically allege the frequency of McGuire's acts and remarks, the level of detail *Fisher* required is not necessary because the circumstances present no uncertainty as to the nexus between the behavior alleged and Thomas's immediate environment and experience.[11]

---

[11] To the extent *Fisher* implies that a heightened pleading standard is justified in hostile environment sexual harassment cases due to the "ease with which these claims can be made despite their serious nature" (see *Fisher*, *supra*, 214 Cal.App.3d at pp. 613-614), we disagree. The same logic was long used to justify the requirement that juries in criminal sexual assault cases be instructed to " ' "examine the testimony of the female person named in the information with caution" ' " because such charges are " ' "easily made and, once made, difficult to defend against, even if the person accused is innocent." ' " (*People v. Gammage* (1992) 2 Cal.4th 693, 695.) The cautionary instruction was disapproved almost 50 years ago for reasons including that the low rate of successful prosecutions for such offenses showed defendants were not "subject to capricious conviction." (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 879-882.) We reject any implication that sexual harassment victims' claims are not to be trusted.

We do not know whether Thomas will be able to prove that McGuire harassed her "because of" her gender—that the behavior she alleged, if it occurred, was not just a gender-neutral function of his coaching style. But "[t]he question of [a] plaintiff's ability to prove [the] allegations, or the possible difficulty in making such proof does not concern the reviewing court" in evaluating the sufficiency of a complaint to withstand demurrer. (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496.) Thomas alleged she was subjected to an environment permeated by McGuire's abusive behavior toward her and the other members of the UCB women's soccer team during the season she played for the team. She alleged that her gender was a "substantial motivating reason" for McGuire's conduct and alleged ample facts to inform McGuire of the basis for her claim and enable him to prepare a defense. Liberally construing the complaint, as we must, her allegations are sufficient to state a cause of action for sexual harassment under Civil Code section 51.9, and her mistake in framing her claim as a violation of the Unruh Act can be cured easily by amendment. The trial court erred in sustaining McGuire's demurrer without leave to amend.[12]

---

[12] Defendants argue that between the federal court action and the present one, Thomas has had five opportunities to state her sexual harassment claim, and the superior court emphasized the opportunities Thomas had had to plead her claim in federal court. Thomas complains that the superior court gave her only one opportunity to do so. Thomas's position is based on the fact that the federal court ultimately refrained from exercising jurisdiction over her state law claims. But it did so on reconsideration, after initially issuing a decision finding Thomas failed to state a claim for violation of the Unruh Act for the same reasons it found she failed to state a claim for gender discrimination in violation of Title IX. Defendants are not wrong in stating that Thomas had more chances to plead her claims than she acknowledges.

#### 4. *Thomas Sufficiently Pleaded Her Claim Against UCB But Not Against Knowlton.*

As to Knowlton and UCB, Thomas's theory of liability is that Knowlton was aware of and failed to act on complaints about McGuire's misconduct; his failure to act constituted ratification of the misconduct; and his ratification is properly imputed to UCB as his employer. Defendants argue the demurrer was properly sustained as to Knowlton because Thomas has provided no legal authority for imposing liability on him under Civil Code section 51.9 and as to UCB because Thomas did not allege UCB ratified McGuire's conduct. Defendants also argue that Thomas did not allege Knowlton and/or UCB received complaints of *sexual* harassment by McGuire.

Ratification is a principle of agency law. (Civ. Code, § 2307 ["An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification"]; *Rakestraw v. Rodrigues* (1972)

---

Nevertheless, Thomas is correct that she was afforded only one opportunity to have her claims evaluated under state notice pleading standards, which are not the same as federal standards governing motions to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure. (*Morris v. JPMorgan Chase Bank, N.A.* (2022) 78 Cal.App.5th 279, 304, fn. 14.) Even in an area where substantive principles are transferable from federal authorities to state cases, as *Morris* cautioned, "[i]t should not be assumed that the standards governing motions to dismiss in federal court and demurrers in state court are the same" and "trial courts should be cognizant that federal district judges have more latitude to dismiss claims at the pleading stage . . . than California trial judges have under our traditional notice pleading standards." (*Ibid.*) For example, when California trial courts consider a demurrer, " 'the facts alleged in the pleading are deemed to be true, however improbable they may be' " (*Hacker v. Homeward Residential, Inc.* (2018) 26 Cal.App.5th 270, 280), while in federal court, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " (*Ashcroft v. Iqbal* (2009) 556 U.S. 662, 678, quoting *Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544.)

29

8 Cal.3d 67, 72 [ratification as "traditional principle of agency law"]; *C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1110 (*C.R.*) [ratification as alternative to respondeat superior for employer's liability for employee's misconduct].) " 'The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery. [Citations.] Whether an employer has ratified an employee's conduct is generally a factual question. [Citation.]' [Citations.]" (*C.R.,* at pp. 1110-1111.) "Principles of ratification apply to a section 51.9 cause of action." (*Id.* at p. 1111.)

According to Thomas's allegations, there had been "documented incidents" of McGuire behaving "erratically and abusively" toward the women on his soccer team since "at least 2009"; McGuire's "behavior was described to the [UCB] athletics administration as creating a culture of fear and intimidation"; and players and their parents complained about McGuire's conduct to Knowlton and "others in the [UCB] administration," but Knowlton and other administrators "disregarded and ignored" the complaints and "allowed [McGuire] to continue his ill treatment of the women athletes on the soccer team." More specifically, as earlier described, the complaint alleged that McGuire's assistant athletic trainer reported that McGuire "physically and psychologically abused his team"; a four-page letter from a team member's mother documented "the abuses suffered by her daughter and other female athletes"; three team members, at a meeting with Knowlton and Simon-O'Neill, "voice[d] their concerns" about McGuire's "mistreatment"; and a report by the OPHD confirmed it had received a report about McGuire's "inappropriate comments about young women's bodies and about 'hickeys' on the young women's necks." Thomas alleged that the players who voiced their

30

concerns were told "there was nothing they could say that would result in [McGuire's] termination," the parent who wrote the letter and subsequently attempted to meet with the Chancellor was told the complaints were "not validated," and the OPHD offered "support services to the player" but did not "intervene" with McGuire.

An employer's "failure to investigate or respond to charges that an employee has committed an intentional tort" or "failure to discharge the employee may be evidence of ratification" by the employer. (*Samantha B. v. Aurora Vista Del Mar, LLC* (2022) 77 Cal.App.5th 85, 109 (*Samantha B.*); *C.R., supra,* 169 Cal.App.4th at p. 1110.) Thomas alleged that Knowlton received multiple complaints that McGuire was mistreating the players on the women's soccer team. We are not persuaded by defendants' arguments that Thomas failed to allege the complaints were of sexual harassment. Defendants emphasize that Thomas's allegations do not describe the complaints as expressly referencing sex or gender. But it is apparent the "abuse" and "mistreatment" Thomas alleges Knowlton was informed of was the conduct she alleged McGuire committed. For the reasons discussed in Discussion part II.B.3 *ante*, the first amended complaint is fairly read as alleging conduct amounting to sexual harassment in the form of a hostile environment based on gender.

Thomas alleged that Knowlton ignored and disregarded the complaints about McGuire's conduct and that Knowlton, as head of the athletics department, was acting as the agent of UCB. These allegations were sufficient to state a claim for employer liability based on ratification. (*Samantha B., supra,* 77 Cal.App.5th at p. 109 [sufficient evidence to avoid nonsuit on claim that hospital ratified employee's sexual abuse of patients; hospital failed to investigate after supervisor informed of employee's

31

reputation for this conduct]; *C.R., supra,* 169 Cal.App.4th at p. 1112 [allegations that managing agents and supervisors were aware employee was sexually abusing patients but refused to take disciplinary or protective action and hid or destroyed evidence sufficient for claim that employer ratified employee's sexual misconduct].)

Defendants argue Thomas failed to state this claim against UCB because she did not allege that *UCB* ratified McGuire's alleged misconduct. By alleging that Knowlton ratified the misconduct while acting in the course and scope of his employment and agency for UCB, however, Thomas did in effect allege UCB ratified it. Moreover, an allegation that UCB ratified McGuire's conduct would be conclusory. What matters is whether Thomas alleged the ultimate facts showing ratification, which she did through her allegations that Knowlton, acting as UCB's employee and agent in his capacity as director of the athletics department, was informed of the misconduct but disregarded it.

Defendants also assert that Thomas "concede[d]" in her opening brief that "it is the *person* who is liable for their actions, because generally, an employer is not liable for the sexual torts of its employees." Read in context, Thomas does not appear to have "conceded" anything more than that an employer's liability for sexual torts or sexual harassment is vicarious—based on its employee's misconduct. *Samantha B.,* the case Thomas cites in support of the quoted statement, explained that under respondeat superior principles, while employers "generally" are not liable for sexual assaults committed by their employees, the employers may be vicariously liable if—as in that case— the sexual assault is deemed "within the scope of employment" because " 'its motivating emotions were fairly attributable to work-related events or conditions.' " (*Samantha B., supra,* 77 Cal.App.5th at pp. 107-108.)

32

*Samantha B.* went on to discuss ratification as an alternative theory of liability and to find substantial evidence that the employer ratified the employee's misconduct—the theory of liability Thomas pursues here.

Thomas's attempt to impose personal liability on Knowlton for ratifying McGuire's alleged misconduct is a different matter. There is no allegation that McGuire was acting as *Knowlton's* agent, only that McGuire and Knowlton were each the employee and agent of UCB. Knowlton's ratification of misconduct by McGuire may be the basis of UCB's liability as employer, but Thomas did not allege that Knowlton was McGuire's employer or had an agency relationship with him, and the facts do not support any inference to that effect.[13]

The cases Thomas cites support her theory that UCB may be liable due to Knowlton's ratification of McGuire's conduct but do not support imposing personal liability on Knowlton. (*Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1182-1183 ["[I]f sexual harassment is perpetrated by a coworker, an employer is liable if it fails to take immediate and appropriate corrective action when reasonably made aware of the conduct"]; *Birschtein v. New United Motor Mfg., Inc.* (2001) 92 Cal.App.4th 994, 1007 ["[A] managerial failure to intervene effectively to prevent or end sexual harassment in the workplace by a fellow employee can amount to a ratification of the misconduct for which the employer may be held liable"].)

---

[13] "An actual agency also may be created by ratification. (Civ. Code, § 2307; see 2 Witkin, Summary of Cal. Law [9th ed. 1987] Agency & Employment, § 39, pp. 51-52.)" (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571.) "But 'ratification is possible only when the person whose unauthorized act is to be accepted purported to act as agent for the ratifying party.' (2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 39, p. 52, italics omitted.)" (*Ibid.*)

We conclude the trial court properly sustained Knowlton's demurrer to the Civil Code section 51.9 cause of action but erred in sustaining UCB's demurrer to this cause of action.

## III.

### *Negligence*

#### A. Background

Thomas's cause of action for negligence alleged that McGuire and Knowlton, as her coach and athletic director, had a "special duty of care" to "avoid subjecting her to discrimination based upon her gender and the injuries she would suffer as a result of such discrimination" and breached that duty of care by releasing Thomas from the team "despite her high quality performance." Thomas alleged that UCB was liable for the "unlawful actions of its employees" pursuant to Government Code section 815.2.

In sustaining the demurrer, the trial court found that there is no common law cause of action for negligent gender discrimination; in any case, Thomas did not adequately allege gender discrimination; and Thomas failed to explain how any "special relationship" created a duty for McGuire to keep her on the team, how the defendants breached any such duty or the decision to release her from the team was negligent.

#### B. Analysis

##### 1. *Thomas Failed to State a Negligence Claim Against McGuire.*

As defendants point out, Thomas's opening brief on appeal appears to abandon her negligence claim against McGuire, arguing only that "[t]he superior court's dismissal of [her] negligence claim against Knowlton and [UCB] was in error." Thomas then argues in her reply brief that "[t]here is no question that McGuire owed [her] a duty of care" which he "violated . . . when he mistreated her while she was a freshman member of

34

the soccer team." Her cursory argument advances a new theory that McGuire's sexual harassment violated his duty of care under Civil Code section 1714 ("[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person") and there is "no barrier for [her] to recover for emotional distress resulting from his negligence."[14] She does not argue McGuire breached a duty of care to her by releasing her from the team, which is the theory she alleged in the first amended complaint.

Thomas offers no explanation for reversing her previously stated limitation of the negligence claim to Knowlton and UCB, and "[r]aising a new theory in a reply brief is improper and unfair to defendants." (*Simpson v. The Kroger Corp.* (2013) 219 Cal.App.4th 1352, 1370 [appellate court may decline consideration of argument first raised in reply brief absent demonstration of good cause for delay].) In any event, to the extent Thomas has not abandoned a claim of negligence against McGuire predicated on sexual harassment, she fails to explain how such a claim would be anything other than a common law cause of action for sexual harassment, which does not exist. (*Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1426-1427 ["There is no common law cause of action for sexual harassment, but conduct constituting sexual harassment may be alleged in common law claims such as battery and intentional infliction of emotional distress"]; *Medix Ambulance Service, Inc. v. Superior Court* (2002) 97 Cal.App.4th 109,

---

[14] For this point, Thomas cites *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 985, a toxic exposure case that held a plaintiff may recover damages for emotional distress "if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty." (*Id.* at p. 985 [damages for emotional distress caused by fear of cancer].)

35

118-119 ["plaintiff cites no authority supporting a common law cause of action for sexual harassment"; "cause of action for sexual harassment is a creature of statute"].)

## 2. *Thomas Failed to Sufficiently Plead a Negligence Claim Against Knowlton and UCB.*

Thomas argues that Knowlton and UCB owed her a special duty to protect her from foreseeable injury by a third party. (*Regents of Univ. of California v. Superior Court* (2018) 4 Cal.5th 607, 613 (*Regents*) [university has special relationship with students imposing duty to protect them from foreseeable violence during curricular activities]; *C.A. v. William S. Hart Union High Sch. Dist.* (2012) 53 Cal.4th 861, 868 (*C.A.*) [school district may be liable for negligence of administrators and supervisors in hiring, supervising and retaining employee who sexually abuses student].) She maintains that she adequately pled her claim by alleging that McGuire sexually harassed her and other female student athletes, defendants had known about his behavior since 2009, an athletic trainer, students and parents reported his behavior immediately before and during the season Thomas played for the team, and Knowlton and UCB did nothing to intervene and protect her and others from McGuire's misconduct.[15]

---

[15] Thomas's theory of liability as to Knowlton and UCB significantly differs from the theory pleaded in her first amended complaint, that Knowlton breached a special duty to avoid subjecting her to gender discrimination by releasing her from the soccer team and that UCB was liable for his action under Government Code section 815.2. On this appeal, Thomas disavows reliance on release from the team as the harm she suffered and argues her negligence claim against UCB is based on Knowlton's negligence in failing to take action in response to complaints that McGuire was subjecting Thomas and her teammates to a gender-based hostile environment, which caused her emotional distress. She had argued this theory in her opposition to the demurrer; defendants challenged her attempt

Defendants argue *Regents* and *C.A.* are distinguishable, largely based on defendants' view that Thomas failed to plead that the risk of McGuire sexually harassing her was foreseeable to Knowlton or UCB. We have rejected defendants' arguments that Thomas failed to plead she was sexually harassed by McGuire and failed to plead that Knowlton received complaints informing him that McGuire was sexually harassing his team. Nevertheless, we are not convinced that *Regents* and *C.A.* support finding the duty Thomas seeks to impose on Knowlton and UCB in the circumstances here.

### a. The "College-Student" Special Relationship

The " 'special relationship' doctrine" is an exception to the rule that "there is generally no duty to protect others from the conduct of third parties." (*Regents, supra,* 4 Cal.4th at p. 627.) Special relationships generally have "an aspect of dependency in which one party relies to some degree on the other for protection" and "the other has superior control over the means of protection," and they "create a duty of care owed to a limited community, not the public at large." (*Id.* at pp. 620-621.)

*C.A.* explained that "a school district and its employees have a special relationship with the district's pupils, a relationship arising from the mandatory character of school attendance and the comprehensive control

_____

to argue a claim she did not plead and did not address its substance, and the trial court did not comment on the matter. But in determining the sufficiency of a complaint against a demurrer, the question is whether " 'the *factual* allegations of the complaint are adequate to state a cause of action under any legal theory. The courts of this state have . . . long since departed from holding a plaintiff strictly to the "form of action" he has pleaded and instead have adopted the more flexible approach of examining the facts alleged to determine if a demurrer should be sustained.' [Citations.]" (*Quelimane Co. v. Stewart Title Guaranty Co., supra,* 19 Cal.4th 26, 38.)

over students exercised by school personnel, 'analogous in many ways to the relationship between parents and their children.' [Citations.]" (*C.A., supra,* 53 Cal.4th at p. 869.) The special relationship imposes "obligations beyond what each person generally owes others under Civil Code section 1714," including "the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally." (*Id.* at p. 870.)

*Regents* recognized a "similar special relationship . . . in the college setting," concluding "postsecondary schools *do* have a special relationship with students while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services. (*Regents, supra,* 4 Cal.4th at pp. 624-625.) "Although college students may no longer be minors under the law, they may still be learning how to navigate the world as adults. They are dependent on their college communities to provide structure, guidance, and a safe learning environment. [¶] . . . [¶] The college-student relationship thus fits within the paradigm of a special relationship. Students are comparatively vulnerable and dependent on their colleges for a safe environment. Colleges have a superior ability to provide that safety with respect to activities they sponsor or facilities they control. Moreover, this relationship is bounded by the student's enrollment status. Colleges do not have a special relationship with the world at large, but only with their enrolled students. The population is limited, as is the relationship's duration." (*Id.* at pp. 625-626.)

The plaintiff in *Regents* was a student who was stabbed by another student during class in a chemistry laboratory. (*Regents, supra,* 4 Cal.4th at p. 617.) As the court stated, "[e]ducation is at the core of a college's mission, and the classroom is the quintessential setting for curricular activities.

Perhaps more than any other place on campus, colleges can be expected to retain a measure of control over the classroom environment." (*Id.* at p. 627.) With respect to the existence of a college-student special relationship, the athletic team setting is not meaningfully different. As *Regents* noted, one of the "unique features of the college environment" is that "[a]long with educational services, colleges provide students social, athletic, and cultural opportunities." (*Id.* at pp. 624-625.) "[A]thletic competition is often an important part of the college environment, benefiting both the students who participate and the schools they represent." (*Id.* at p. 624.) Thomas alleged that McGuire subjected her and her teammates to sexual harassment during practices and training sessions.

*Regents* appears to compel a conclusion that the coach of a university sports team has a special relationship with an undergraduate student athlete on that team. It does not necessarily follow, however, that the existence of this special relationship entails the particular protective duty Thomas seeks to impose.

### b. Scope of the Duty

As *Regents* explained, "[w]hether a new duty should be imposed in any particular context is essentially a question of public policy. 'The existence of " ' "[d]uty" is not an immutable fact of nature " 'but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection.' " ' " [Citation.]' [Citation.]" (*Regents, supra,* 4 Cal.5th at pp. 627-628.) Additionally, a number of factors "may, on balance, justify excusing or limiting a defendant's duty of care. These include: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame

attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*).)" (*Id.* at p. 628.)

As defendants point out, unlike the present case, *Regents* and *C.A.* involved schools' failure to protect students from physical injury. *C.A.* held that "a public school district may be vicariously liable under section 815.2 for the negligence of administrators or supervisors in hiring, supervising and retaining a school employee who sexually harasses and abuses a student." (*C.A., supra,* 53 Cal.4th at p. 879.) The facts make clear that the "sexual harassment" was physical: Plaintiff alleged that when he was 14 to 15 years old, his high school guidance counselor exploited her position of authority and trust to require him to engage in sexual activities with her. (*Id.* at p. 866.) Alleging that the defendants knew or should have known of the counselor's past sexual abuse of minors and propensity to engage in such abuse, the plaintiff sought to hold the school district liable for the negligence of supervisory and administrative personnel in hiring, retaining and inadequately supervising the counselor. (*Id.* at pp. 865-867.)

The plaintiff in *Regents* was a student who was stabbed during a chemistry lab by a fellow student who school administrators knew was experiencing auditory delusions and believed other students, specifically including the plaintiff, were harassing him. (*Regents, supra,* 4 Cal.5th at pp. 613-617.) *Regents* held that "universities have a special relationship with their students and a duty to protect them from foreseeable violence during curricular activities." (*Id.* at p. 613.)

40

Thomas alleges she was harmed not physically but psychologically and emotionally by being subjected to a hostile environment due to sexual harassment. She argues that the absence of physical injury does not distinguish her claim from those in *Regents* and *C.A.* but engages in none of the analysis those cases employed to determine whether the institution owed a duty to protect against the harm inflicted. Thomas asserts that "[a]lthough [*Regents*] and [*C.A.*] dealt with shocking physical conduct as well as, in the case of *C.A.*, sexual harassing conduct, both cases support the conclusion that a special relationship exists between a student and her University where she in engaged in school activities," then appears to assume this special relationship necessarily supports a duty to take reasonable measures to protect students against *any* foreseeable injury or harm inflicted by a third party.

*Regents* and *C.A.* both analyzed the *Rowland* factors in determining the scope of the duty arising from the school-student special relationship they recognized, *Regents* in considerable depth. (*Regents, supra,* 4 Cal.5th at pp. 628-634; *C.A., supra,* 53 Cal.4th at pp. 877-879.) The type of harm at issue was an obvious factor in these analyses. *Regents* noted, for example, that while " 'the degree of *certainty* that the plaintiff suffered injury' (*Rowland, supra,* 69 Cal.2d at p. 113, italics added [in *Regents*]) may come into play when the plaintiff's claim involves intangible harm, such as emotional distress[,]" *Regents* was "addressing claims for physical injuries that are capable of identification." (*Regents,* at p. 630.) The *C.A.* court addressed the significance of physical injury with respect to the "moral blame attached to the defendant's conduct" regarding hiring or retention, explaining that "unless the employee's propensities posed a substantial risk of personal injury to the plaintiff or others in the same circumstances, there is again

41

little moral blame to assign." (*C.A.*, at pp. 877, fn.8, 878.) *C.A.* noted a previous case in which it held that school district staff had a duty not to misrepresent in letters of recommendation the character and qualifications of a previously employed teacher with a history of sexual misconduct, but limited liability to "circumstances in which the misrepresentation 'present[ed] a substantial, foreseeable risk of physical injury to the third persons.' " (*Id.* at p. 877, quoting *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1081.)

The cases concerning the school- or college-student relationship discussed in *Regents* and *C.A.* similarly involved claims of physical violence or sexual abuse. (E.g., *J.H. v. Los Angeles Unified School District* (2010) 183 Cal.App.4th 123, 127, 148 [physical and sexual assault and battery of student by other students during after school program on grade school campus; duty of ordinary care in supervision of children on school premises]; *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 152, 162-163 [college baseball player injured by pitch to head; duty of school hosting intercollegiate athletic event to "not increase the risks inherent in the sport"]; *M.W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 511 [special education student sodomized by another student in school restroom before start of class; school district duty of care to protect from foreseeable assault due to inadequate supervision]; *Virginia G. v. ABC Unified School Dist.* (1993) 15 Cal.App.4th 1848, 1851, 1855 [student sexually assaulted by teacher; school district employees' duty to protect from harm resulting from negligent hiring/supervision of teacher with history of sexual misconduct]; *Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1458-1460 [student battered by nonstudent in high

42

school restroom while changing for wrestling practice; school authorities' duty to protect from foreseeable assault in unsupervised location].)

Thomas cites no authority imposing on a university a duty to protect students from harm of a non-physical nature. She asks us to extend existing authority imposing a duty of care to protect against foreseeable physical harm to the harm resulting from hostile environment sexual harassment without in any way analyzing why this new duty should be imposed and what parameters should define its scope. In failing to develop her argument, Thomas fails to meet her burden on appeal. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [appellate court " 'not bound to develop appellants' arguments for them' " and may " 'disregard conclusory arguments that . . . fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt' "].) This is not to say sexual harassment in the form alleged in this case does not cause significant harm, nor that a university may never be held to have a duty to protect its students from non-physical injuries. We simply are not prepared to take the step Thomas suggests on the basis of the briefing she has provided.[16]

---

[16] Thomas also asserts, without elaboration, that "[e]ven absent a special duty imposed, liability may be imposed upon [UCB] under more traditional employer liability, where the relationship between head coach and player in the University setting can easily be seen as an employee-employer relationship." Thomas offers no argument or authority to support her characterization of the college coach-player relationship (*Hernandez v. First Student, Inc., supra,* 37 Cal.App.5th at p. 277 [appellate court may disregard argument unsupported by legal analysis and authority]) and improperly raises this new alternative theory of liability for the first time in her reply brief (*Simpson v. The Kroger Corp., supra,* 219 Cal.App.4th at p. 1370 [raising new theory in reply brief improper and unfair to defendants]). We will not consider it further.

### 3. *The Trial Court Did Not Abuse Its Discretion in Denying Leave to Amend.*

Thomas argues the trial court did not make a finding that there was no reasonable possibility the defects in her negligence cause of action could be cured by amendment and the court's findings that Thomas failed to allege certain elements of a negligence claim "demonstrate that denial of leave to amend was in error." Again, Thomas ignores the fact that it is her burden to demonstrate how an amendment would cure the defect. (*Chodosh v. Commission on Judicial Performance* (2022) 81 Cal.App.5th 248, 269.) She did not suggest how she could amend her claim in the trial court, and she does not do so in her briefs here; she merely asserts she should be allowed to amend.

## IV.

## *Breach of Fiduciary Duty*

## A. Background

Thomas's cause of action for breach of fiduciary duty alleged that McGuire "cultivated a special relationship of trust" with her and agreed to act on her behalf "for the advancement of her athletic career"; he had "the power to determine how [her] career as a collegiate soccer player would proceed based upon his authority over the team"; she entrusted him to

---

Thomas asserts that defendants, in the trial court, acknowledged they "may owe a duty" to her. She cites a portion of defendants' demurrer stating, "Cal. Civ. Code § 1714 states that persons have a duty to use due care to avoid injury to others. With respect to athletics, courts have found the existence of specific duties in a variety of scenarios, the scope of such duties depending on the context at issue. *See Knight v. Jewett*, 3 Cal. 4th 296, 318 (1992). But Plaintiff will be unable to point to any authority recognizing the existence of the specific duties allegedly breached in this case." We do not see how this passage amounts to an acknowledgment that defendants may owe a duty to Thomas in the present case.

44

"utilize and exercise that power in her interest when she gave up a scholarship at the University of Colorado and accepted his invitation to play at [UCB]; he violated his fiduciary duty "by exercising his power in an arbitrary and discriminatory way"; and he caused her harm by failing to "act as a reasonably careful Coach would have acted under the same or similar circumstances." She alleged UCB was liable under Government Code section 815.2 for "unlawful actions of its employees." As described in Thomas's opposition to the demurrer, the alleged breach of fiduciary duty was McGuire's releasing her from the team despite her successful performance and adherence to McGuire's training demands.

The trial court found that Thomas's allegations did not reflect a decision by McGuire to voluntarily undertake a fiduciary obligation to her, her allegation that she placed trust in him was insufficient to support finding a fiduciary relationship, and the allegations did not reflect the existence of a relationship imposing a fiduciary duty as a matter of law.

### B. Governing Principles

A fiduciary duty is "a duty 'to act with the utmost good faith for the benefit of the other party.' " (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1160.) It can arise from " ' "a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client" or from a " ' " 'confidential relationship' . . . founded on a moral, social, domestic, or merely personal relationship.' " ' " (*Ibid.*) The "essential elements" of a confidential relationship have been described as " '1) The vulnerability of one party to the other which 2) results in the empowerment of the stronger party by the weaker which 3) empowerment has been solicited or accepted by the stronger party and 4)

45

prevents the weaker party from effectively protecting itself.' " (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 272.)

" '[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.' " (*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 246.) "The mere placing of a trust in another person does not create a fiduciary relationship." (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 13.) "Whether a fiduciary duty exists is generally a question of law." (*Marzec v. California Public Employees Retirement System* (2015) 236 Cal.App.4th 889, 915 (*Marzec*).)

## C. Analysis

### 1. *Thomas Did Not State Claim for Breach of Fiduciary Duty.*

Thomas uses the terms confidential relationship and fiduciary relationship somewhat interchangeably. She maintains that a confidential relationship exists between student athletes and their coaches based on the hierarchical nature of the coach-athlete relationship and power a coach has over student athletes. She contends she alleged facts sufficient to support the existence of a fiduciary relationship in that she was a college freshman; McGuire was the head coach and recruited her to play on the women's soccer team; McGuire demanded that his athletes trust his advice and direction; Thomas trusted his representations to her and trusted that he had her athletic career in mind when making decisions and giving her direction; that she was successful in the program, trained as directed and was told by McGuire that she was a promising player; and that despite her successful freshman year, she was released from the team, which was uncommon and "even more inexplicable" in light of her performance.

46

Neither of the parties offer California cases on point, and we are aware of none.[17]  Thomas cites no authority for finding a fiduciary relationship between student-athletes and their coaches, attempts to distinguish authority to the contrary, and likens her situation to cases involving other relationships between students and university officials.

The trial court relied on *Knelman v. Middlebury Coll.* (D.Vt. 2012) 898 F.Supp.2d 697 (*Knelman*), in which a college student challenged his dismissal from the varsity hockey team.  *Knelman* noted that the Vermont Supreme Court had never "recognized a fiduciary relationship between a student and a school or school official," and federal courts in the Second Circuit had "held that a fiduciary relationship generally does not exist in the school context."  (*Id.* at p. 717.)  The court explained:  "In rejecting a fiduciary relationship between a school and one of its students, courts have reasoned that schools and school officials owe duties to *all* students, and fiduciary relationships typically involve a special relationship between the parties which requires the fiduciary to exalt the interests of his or her dependent

---

[17]  Defendants cite a Court of Appeal opinion that was superseded when the California Supreme Court granted review and subsequently issued its opinion in *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, indicating that the Supreme Court affirmed a portion of the uncitable opinion commenting that although teachers are "not fiduciaries" of their students, they occupy a position of trust.  Aside from the impropriety of attempting to rely on uncitable authority, there is no basis for defendants' apparent suggestion that the Supreme Court agreed with the "not fiduciaries" comment.  The Supreme Court's opinion does not mention the term or discuss the concept of fiduciaries or fiduciary relationships.  It affirmed the Court of Appeal's judgment insofar as the Court of Appeal reversed a grant of nonsuit based on untimeliness of the plaintiff's claim but did so to permit litigation of a different theory of timeliness than the delayed discovery rule relied on by the Court of Appeal.  (*John R.,* at pp. 444, 452.)  It was in the discussion of the delayed discovery rule that the Court of Appeal made the "not fiduciaries" comment.

over the competing interests of others, and to act exclusively on the dependent's behalf. Such a relationship would immediately prove unworkable in the school context." (*Id.* at p. 718.) Imposing a fiduciary duty in the circumstances of that case, *Knelman* stated, would "create an untenable situation in which a college simultaneously owed a fiduciary duty to students with competing interests, whose interests were not only also separate and distinct from one another's, but also often in conflict with the interests of the college itself." (*Id.* at p. 719.)

*Knelman* also distinguished cases from other jurisdictions that had "denied dispositive motions in the school context." (*Knelman, supra,* 898 F.Supp.2d at p. 718.) In those cases, *Knelman* explained, the "alleged fiduciary relationships were created by special circumstances" and the courts "recognized that when school officials affirmatively exploit a position of trust or authority over a student to the student's detriment, the existence of a limited fiduciary duty may be a question of fact for the jury." (*Id.* at p. 719.) No such special circumstances had been shown by the plaintiff in *Knelman.* (*Id.* at p. 719.)

Thomas complains about defendants' reliance on *Knelman*'s explanation of the reasons courts have not found fiduciary relationships in the school context, arguing that *Knelman*'s "dicta" addressed only relationships between students and universities, not between student athletes and their coaches. Thomas maintains the latter are "unquestionably distinct" due to the power imbalance between student athletes and their coaches.[18] The alleged fiduciary relationship in *Knelman was* between a

_____

[18] Thomas cites *National Collegiate Athletic Association v. Alston* (2021) 594 U.S. __ [141 S.Ct. 2141] (*Alston*), in support of her distinction between the relationship of a student-athlete with her coach and university

48

student athlete and his coach; the court applied the reasoning of courts addressing other student-university relationships to the case before it. *Knelman*'s point—that imposition of a fiduciary duty would be untenable in the school context because the school, or school employee, would simultaneously owe the same duty to other students with competing interests—is as true for a coach vis-à-vis student-athletes on his team as for other university employees. Thomas fails to explain how McGuire could owe her a fiduciary duty based on their relationship as coach and player that would elevate her interests over those of her teammates, who have the same coach-player relationship, and over the interests of the team as a whole and the university.[19]

and the relationship of other students with the university. *Alston* involved an antitrust challenge to National Collegiate Athletics Association (NCAA) rules limiting the compensation available to student-athletes. (*Alston,* at p. 2151.) Thomas cites portions of the opinion discussing the history of American colleges and universities' "complicated relationship with sports and money" (*id.* at p. 2148) and the power of NCAA and its member colleges over student-athletes' compensation, which allows colleges and NCAA executives to benefit from the massive revenue produced by student-athletes whose compensation they suppress. (*Id.* at p. 2168, conc. opn. of Kavanaugh, J.)

 *Alston* does not discuss student-athletes' relationships with their coaches. Whatever inferences may be drawn from the opinion's discussion of the high stakes competitive collegiate sports "market" about the imbalance of power between student-athletes and their coaches as compared to that between students and their teachers or universities generally, we fail to see how *Alston* furthers Thomas's argument that the nature of the relationship between a student-athlete and coach supports finding a fiduciary relationship with one player whose interests may diverge from those of her teammates or the team as a whole.

 [19] Thomas also attempts to distinguish *Knelman* on the basis that "unlike California, which recognizes a type of fiduciary relationship created by the exploitation of a confidential relationship," Vermont law makes the existence of a fiduciary relationship a question of law. *Knelman* indeed

Defendants cite several other cases declining to find fiduciary relationships between athletes and coaches. *Powell v. Seton Hall University* (D.N.J. Apr. 26, 2022) 2022 WL 1224959 dismissed the claims of student athletes who were injured during university-sponsored athletic events and alleged they were not properly informed of the extent of their injuries or provide adequate medical care and advice. The district court stated, "Plaintiffs have not cited, and the Court has been unable to find, any case decided by either the New Jersey Supreme Court or any lower courts of that state which have held that there exists a fiduciary relationship between a

stated that "[u]nder Vermont law, the existence or nonexistence of a fiduciary relationship is a question of law for the court." (*Knelman, supra,* 898 F.Supp.2d at p. 717.) But it appears from the discussion in *Knelman* and the cases it cited that what it was referring to as a question of law was the existence of a fiduciary *duty*—which is also a question of law under California law. (*Marzec, supra,* 236 Cal.App.4th at p. 915.) And, as we have said, *Knelman* found that case did not involve special circumstances that might support finding a fiduciary relationship as a question of fact. (*Knelman,* at p. 719.)

The cases *Knelman* cited for its statement that the existence of a fiduciary relationship is a question of law referred to the existence of a fiduciary *duty*. (*Doe v. Newbury Bible Church* (D.Vt. July 20, 2005) 2005 WL 1862118, at p. *6 [the "existence or non-existence of the [fiduciary] relationship and corresponding duties is a question of law for the court to decide"]; *McGee v. Vermont Federal Bank* (Vt. 1999) 726 A.2d 42, 44 ["existence or nonexistence of a duty is a question of law" and "[i]n order for the Bank to have become a fiduciary, the relationship had to ripen into one in which the [plaintiffs] were dependent on, and reposed trust and confidence in, the Bank in the conduct of its affairs"].) Vermont, like California, appears to recognize that a fiduciary relationship may exist "as a matter of law in certain relationships" but also may arise from factual circumstances. (*Miller v. Rosenberry* (Vt. 1958) 144 A.2d 836, 839-340 [complaint failed to establish "any legal relationships which would constitute the defendants to be fiduciaries as a matter of law" and was "equally deficient in pleading any conduct or condition . . . capable of creating a fiduciary relationship as an issue of fact"].)

university or coach and a student-athlete.  '[I]t is not the role of a federal court to expand state law in ways not foreshadowed by state precedent.' " (*Id.* at p. \*7.)  Thomas points out that the court found the breach of fiduciary duty claim duplicative of the plaintiffs' gross negligence claim, which was permitted to proceed for one of the plaintiffs, but the court's comments on the duplicative nature of the claim were expressly dicta, prefaced with "though not necessary to resolve Defendants' motion." (*Id.* at p. \*8.)

*Cook v. Kudlacz* (Ct.App.Ohio 2012) 974 N.E.2d 706 affirmed summary judgment for the defendants in a suit by a high school varsity tennis player who alleged she was intimidated, harassed, isolated, treated unfairly and bullied by teammates and the coach of the girls' tennis team.  The court explained that "[t]here is no case that provides that a coach would definitely have a fiduciary relationship with the player"; it was "difficult, if not impossible to find that a de facto relationship was created" because the plaintiff did not tell anyone at the school that she felt she was being intimidated and "said she did not trust them"; and the conduct she alleged did not "rise to a level of intimidation." (*Id.* at p. 724.)  Thomas views *Cook* as supporting her argument that the existence of a fiduciary relationship based on a confidential relationship should not be evaluated at the pleading stage. But the fact that allegations in a different case might have supported finding a confidential relationship if proven does not undermine the propriety of dismissing a claim at the pleading stage where the facts alleged, taken as true, do not support finding a confidential relationship and there is no reasonable prospect of further amendment curing the defects.[20]

---

[20]  The same is true of *McGee v. Curry* (S.D.Tex. Feb. 25, 2011) 2011 WL 13262005, which granted summary judgment in favor of a professional football player's claim for breach of fiduciary duty against his

51

Thomas argues the trial court erred in concluding that the single allegation that McGuire "cultivated a special relationship of trust and agreed to act on her behalf for the advancement of her athletic career" was conclusory and that her mere placement of trust in McGuire was insufficient to create a fiduciary relationship, without considering her allegations about "the typical relationship between coach and student-athlete and the relationship with her that McGuire cultivated." We do not agree. Thomas does not, and cannot, dispute that a confidential relationship cannot be imposed unilaterally. (*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC, supra,* 158 Cal.App.4th at p. 246; *Zumbrun v. University of Southern California, supra,* 25 Cal.App.3d at p. 13.) Thomas's allegation that McGuire "cultivated a special relationship of trust by [her] in his good faith and agreed to act on [her] behalf for the advancement of her athletic career" is conclusory, as the trial court said: It does not offer facts in support of the conclusion stated. The trial court explained what was missing in its further

_____

coach based on the coach's alleged complicity in another party's fraudulent financial transactions with the player.

　　Defendants quote the *McGee* court's statement that " 'not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.' " (*McGee v. Curry, supra,* 2011 WL 13262005, at p. *6.) But the case is not particularly relevant here, as the claimed breach of fiduciary duty did not involve the former coach's conduct toward the player in his role as coach. The player did not contest the coach's argument that state law did not recognize a formal fiduciary relationship between coach and player; the question was whether there was a triable issue of fact as to the existence of an informal fiduciary relationship arising from " 'a moral, social, domestic or purely personal relationship of trust and confidence.' " (*Ibid.*) The court found there was not, as the player presented no evidence of a personal relationship and the only two instances in which the coach allegedly provided advice and guidance were insufficient to raise a genuine issue of fact. (*Id.* at p. *7.)

comment that the allegation "does not reflect a decision by McGuire to voluntarily undertake a fiduciary obligation to plaintiff." None of the allegations Thomas claims the trial court failed to consider allege *facts* demonstrating that McGuire cultivated a "special relationship of trust" with her or agreed to act on her behalf to advance her career. The allegations that McGuire recruited Thomas to the women's soccer team, she followed his training demands and performed well, he told her she was a promising player, and it is uncommon for a player to be released despite successful performance and adherence to training demands might support finding an expectation on Thomas's part that she would remain on the team. They do not allege facts supporting a conclusion that McGuire agreed to keep Thomas on the team or otherwise act to advance her career and interests above and beyond the potentially conflicting interests of her teammates.

One of the allegations Thomas maintains the trial court failed to consider—the only one expressly referring to McGuire seeking her trust—illustrates this point. Thomas states that her complaint "identifies McGuire's demand for her trust and her acquiescence to that demand." In the paragraph Thomas cites, she alleged: "Success on a Division One college athletics team like [UCB] creates opportunities for young women to play professional and international soccer. Each player including [Thomas] strives for athletic and academic success in order to advance her career in athletics. It is part of a coach's commitment to his or her athletes to foster such opportunities and the success of individual athletes as well as the team as a whole. [McGuire] as the coach of a prestigious women's soccer program demanded that his athletes trust in his advice and direction. [Thomas] trusted [McGuire's] representations to her and that he had her athletic career in mind when making decisions and giving direction about her performance."

53

Putting aside the fact that much of this paragraph is conclusory, it is clear Thomas alleged that McGuire demanded trust from and assumed a commitment to *all* of his players.  At least with regard to the issue underlying Thomas's breach of fiduciary duty claim—release from the team— it is evident that McGuire could not simultaneously owe each of his players a fiduciary duty requiring him to put that player's interests first and foremost.

Thomas's attempt to liken her situation to that of the students in *Jumbo v. Alabama State Univ.* (M.D.Ala. 2017) 229 F.Supp.3d 1266, 1273, and *Chou v. University of Chicago* (Fed. Cir. 2001) 254 F.3d 1347, 1372, is not persuasive.  Citing those cases, Thomas argues that a student may have a fiduciary relationship with a university or university officials where something in the relationship gives the officials " 'overmastering influence' " over the student.  (*Jumbo,* at p. 1273.)  The plaintiffs in *Jumbo* were students attending an Alabama university under a sponsorship program from the Nigerian government.  (*Id.* at pp. 1269-1270.)  They alleged the university limited their access to and converted to its own use sponsorship funds that Nigeria remitted to the university with the proviso that any money not used for tuition and fees be disbursed to the students for personal expenses. (*Id.* at p. 1270.)  Although no Alabama case law had recognized "a general fiduciary duty owed by universities to their students," *Jumbo* held that "a confidential relationship" may have arisen on the particular facts of that case because the university's alleged practice "places the [s]tudents' purse strings firmly in the grasp of the [u]niversity, giving it the sort of 'overmastering influence' over the [s]tudents that is a hallmark of a fiduciary relationship. [Citation.]  The [u]niversity's control over the [s]tudents' sponsorship money similarly puts the [s]tudents into a position of 'weakness, dependence, or

trust,' and opens the door for the [u]niversity to obtain 'an unfair advantage' by exercising 'dominion' over the [s]tudents." (*Jumbo,* at pp. 1272-1273.)

*Chou v. University of Chicago, supra,* 254 F.3d at pages 1362-1363 held a former graduate student stated a claim for breach of fiduciary duty against her faculty advisor and department chairman, who she alleged named himself as an inventor of her discoveries in patent applications. *Chou* explained that under Illinois law, a fiduciary duty may arise from "special circumstances of the parties' relationship, such as when one party justifiably places trust in another so that the latter gains superiority and influence over the former." (*Id.* at p. 1362.) Chou alleged that the advisor "held a position of superiority over her as her department chairman, and that he had specifically represented to her that he would protect and give her proper credit for her research and inventions. Given the disparity of their experience and roles, and [the advisor's] responsibility to make patenting decisions regarding Chou's inventions, Chou has adequately pleaded the existence of circumstances that place on [the advisor] a fiduciary duty with respect to her inventions." (*Ibid.*)

Thomas views her relationship with McGuire as similar to those at issue in *Jumbo* and *Chou* due to the power and control a coach has over a student-athlete. Those cases, however, involved special circumstances in which "school officials affirmatively exploit[ed] a position of trust or authority over a student to the student's detriment." (*Knelman, supra,* 898 F.Supp.2d at p. 719 [distinguishing *Chou*].) Thomas's allegations are not comparable. Even accepting the inherent imbalance of power in the student-athlete and coach relationship, Thomas has not alleged facts demonstrating that McGuire assumed an obligation to protect her interest in continuing to play on the

55

women's soccer team over and above the interests of other players or the team as a whole.

### 2. *The Trial Court Did Not Abuse Its Discretion in Denying Leave to Amend.*

As with her sexual harassment and negligence claims, Thomas maintains the trial court erred in denying her an opportunity to allege additional facts to demonstrate McGuire breached a fiduciary duty to her. As with her other claims, she asserts her right to amend but, as in the trial court, offers no suggestion how she would do so. Thus, as with her other claims, she has failed to meet her burden to prove "how an amendment would cure the defect." (*Chodosh v. Commission on Judicial Performance, supra,* 81 Cal.App.5th at p. 269.)

## V.

### *Fraud*

#### A. Background

The second amended complaint alleged a cause of action for fraud based on misrepresentation and failure to disclose material facts. According to Thomas's allegations, McGuire failed to disclose that Thomas "might be removed from the team for other than justified reasons such as deficient play or bad conduct" or that McGuire "would put the interests of unqualified student athletes or himself above her interests"; McGuire "knew that the statements he made to induce [Thomas] to join the team were false at the time that he made them"; McGuire "had a duty to disclose this information to [Thomas] because he was actively concealing the information," "made partial disclosures to induce her attendance" and "had exclusive knowledge of the facts he was concealing"; and McGuire "intended to deceive [her] when he advised her that she would remain a member of the women's soccer team at [UCB] as long as she played competently and in accordance with his

56

instructions and met his standards of behavior" and "failed to disclose that he would allow unqualified players to become members of the team and thereby jeopardize her own status as a team member."

The trial court sustained the demurrer because it found both that Thomas had not alleged all the required elements of her fraud claim[21] and that McGuire was entitled to immunity under Government Code section 822.2 (misrepresentation). Thomas contends the court was wrong on both points. McGuire defends the trial court's decision and adds that he was also entitled to immunity under Government Code section 820.2 (discretionary act). As we will explain, the immunity afforded by Government Code section 822.2 applies. Because that issue is determinative, we need not determine whether the second amended complaint sufficiently stated the elements of a cause of action for fraud or whether McGuire would also be immune under Government Code section 820.2.[22]

---

[21] The court found that Thomas did not allege McGuire knew at the time he recruited her that "he would release her from the team for any reason, and intentionally misrepresented or concealed that fact from her at the time of recruitment," that "McGuire himself was directly involved in inappropriately recruiting any other players who were unqualified to play, or that he knew that his involvement in such activities would cause her to later lose her spot on the team."

[22] Defendants contend the fraud allegations in the second amended complaint are barred by the sham pleading doctrine. "Under the sham pleading doctrine, a plaintiff cannot avoid allegations that are determinative to a cause of action simply by filing an amended complaint which omits the problematic facts or pleads facts inconsistent with those alleged in the original complaint." (*Tindell v. Murphy* (2018) 22 Cal.App.5th 1239, 1248.) As the trial court noted, Thomas's original and amended complaints in federal court alleged that she joined the UCB women's soccer team with McGuire's "implicit promise" that she would continue to play as long as she

## B. Governing principles

" 'To establish a claim for fraudulent misrepresentation, the plaintiff must prove: "(1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff." ' [Citation.]

"The required elements for fraudulent concealment are: (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she

---

performed well. Her initial complaint and first amended complaint in state court alleged that she joined the team with McGuire's "assurances" that she would continue to play as long as she performed well. Her second amended complaint for the first time described the "assurances," alleging that McGuire told her she would be on the team for four years, she was the "missing piece" overlooked in that year's recruitment, and she would be his "all-around player for the next four years," and diagramming how "he would utilize a player like her."

Defendants see the detailed allegations describing express statements by McGuire that Thomas would be on the team for four years as inconsistent with Thomas's initial allegations of an "implicit promise." Thomas maintains she was simply clarifying "any ambiguity" in her pleadings in response to the court's order finding the fraud allegations in the first amended complaint uncertain. It is not necessary for us to resolve the point, as our decision on the fraud claim turns on immunity and not whether Thomas sufficiently stated the elements of fraud.

had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact. [Citation.]" (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 605-606.)

Pursuant to Government Code section 822.2, "[a] public employee acting in the scope of his employment is not liable for an injury caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is guilty of actual fraud, corruption or actual malice." "The Government Code does not define 'misrepresentation.' California law recognizes several categories of fraud and deceit, including negligent and intentional misrepresentation. (Civ. Code, §§ 1572, 1710.) The courts have assumed that the immunity includes all types of fraud and deceit cases including fraudulent concealment." (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 867, fn. omitted (*Michael J.*).)

Section 822.2 immunity "is not absolute. Rather, it applies only when the negligent or intentional wrongdoing involves interferences with financial or commercial interests. [Citations.] It 'does not apply to . . . misrepresentations involving a risk of physical harm.' (*Garcia v. Superior Court* [(1990)] 50 Cal.3d [728,] 738, fn. 8.)" (*Adkins v. State of California* (1996) 50 Cal.App.4th 1802, 1818, disapproved on other grounds in *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1156-1158.)[23]

---

[23] Public entities are immune from liability for misrepresentation pursuant to Government Code section 818.8: "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional." This statute does not contain the exception for "actual fraud, corruption or actual malice" stated for public employees' immunity under Government Code section 822.2.

**C. Analysis**

### 1. *Thomas's Fraud Claim Is Subject to Government Code Section 822.2 Immunity.*

Thomas contends Government Code section 822.2 does not confer immunity for McGuire's alleged fraud because his conduct did not interfere with her commercial or financial interests. She argues that "[c]ommercial interests to which immunity might attach include 'leasing and purchasing property or contracting for a pension'" but not "financial loss." *Michael J., supra,* 201 Cal.App.3d 859, which Thomas relies on for this point, was an action against the county adoptions department by an adoptive parent and adoptee seeking damages for emotional distress and medical expenses. Ten years after the adoption, the adoptee was diagnosed with a congenital degenerative nerve disorder; the suit alleged that, prior to placement, the county failed to determine the adoptee's medical condition and made misrepresentations of complete health." (*Id.* at p. 863.)

*Michael J.* reviewed the analysis of *Johnson v. State* (1968) 69 Cal.2d 782 (*Johnson*), which held that misrepresentation immunity did not apply in an action for personal injuries by a foster parent who was assaulted by a teenager placed in her care and had not been informed of the youth's dangerous propensities. (*Michael J., supra,* 201 Cal.App.3d at pp. 868-869; *Johnson,* at pp. 784-785, 799-800.) *Johnson* discussed the history of the immunity provision and determined that the Legislature "must have had in mind those areas in which private defendants typically face liability for 'misrepresentation.' [¶] . . . [¶] '[M]isrepresentation,' as a tort distinct from the general milieu of negligent and intentional wrongs, applies to interferences with financial or commercial interest." (*Johnson,* at p. 800.) After considering subsequent cases consistent with *Johnson,* the *Michael J.* court concluded, "The adoption process is not a commercial transaction, such

60

as leasing and purchasing property or contracting for a pension.  The immunity provided governmental entities and public employees by sections 818.8 and 822.2 does not shield the County from liability for misrepresentation and deceit in this social service area, designed to serve the interests of society by acting in the best interests of the child. . . .  Although appellants suffer a financial loss in the sense that they have incurred, and will continue to incur, substantial medical expenses, their loss did not result from a commercial transaction with the County nor from the County's interference with a commercial transaction." (*Michael J.,* at p. 872.)

Thomas likens her position to that of the plaintiffs in *Michael J.,* arguing that like them, she alleged that she suffered financial losses due to McGuire's misrepresentations but did not allege the type of interference required for application of Government Code section 822.2 immunity because she was not involved in a commercial transaction with McGuire or UCB.  But Thomas's claims are nothing like those in *Michael J.*, where the alleged misrepresentations concerned physical health and welfare.  Thomas alleged misrepresentations that induced her to forgo a scholarship at another university and incur the cost of attending UCB in order to play soccer on a team and for a coach that Thomas saw as enhancing her ability to pursue a career in professional sports.  Indeed, Thomas's own arguments about the nature of coaches' influence on student athletes and their future prospects imply a commercial aspect to collegiate athletics despite the educational setting.  According to Thomas's allegations, both her present and future financial interests were directly at stake when she agreed to play soccer for UCB in reliance on McGuire's representations.

The reference in *Michael J.* to a commercial transaction "such as leasing and purchasing property or contracting for a pension" was

illustrative, serving to distinguish the risk of physical harm at issue in that case from financial interests at issue in cases applying misrepresentation immunity. (*Michael J.*, *supra,* 201 Cal.App.3d at p. 872.) That distinction— between misrepresentations concerning risk of physical harm, which are not subject to immunity, and misrepresentations related to financial interests, which may be—is clear. (*Johnson, supra,* 69 Cal.2d at pp. 799-800; *Garcia v. Superior Court, supra,* 50 Cal.3d at p. 738, fn. 8 ["statutory immunity from liability for misrepresentations (Gov. Code, §§ 818.8 and 822.2) does not apply to negligent misrepresentations involving a risk of physical harm"]; *Adkins v. State of California, supra,* 50 Cal.App.4th at pp. 1818-1819 [misrepresentation immunity inapplicable to personal injury claims of workers hired by the state who alleged state intentionally lied about the safety of chemicals they handled].) It does not, however, resolve what types of financial interests justify application of misrepresentation immunity.

Courts have applied misrepresentation immunity to cases involving a variety of financial interests. (E.g., *County of San Bernardino v. Superior Court* (2022) 77 Cal.App.5th 1100, 1112-1115 [registrar of voters misrepresented number of signatures required for initiative petition to repeal special tax, resulting in unnecessary costs for obtaining more signatures than necessary]; *Burden v. County of Santa Barbara* (2000) 81 Cal.App.4th 244, 251-252 [misrepresentations concerning terms of employment alleged to have damaged plaintiff's financial interests by causing him to relocate, then upon termination return to former position under less favorable conditions]; *Masters v. San Bernardino County Employees Retirement Assn.* (1995) 32 Cal.App.4th 30, 43 [misrepresentations relating to processing of application for disability pension]; *Harshbarger v. City of Colton* (1988) 197 Cal.App.3d 1335, 1342 [misrepresentations by building inspectors

resulting in homeowners having to reconstruct home].)  In a setting more akin to the present case, *Brown v. Compton Unified School District* (1998) 68 Cal.App.4th 114, 117, held school district employees were immune from liability for alleged misrepresentations that caused a student to lose a college scholarship.  *Chevlin v. Los Angeles Community College Dist.* (1989) 212 Cal.App.3d 382, 390, found misrepresentation immunity applicable to a student's claim that an instructor fraudulently concealed objectives required for successful completion of the program.[24]

Here, Thomas alleged that McGuire's misrepresentations caused her to lose the value of the scholarship she had been offered by the University of Colorado and incur the cost of attending UCB and harmed her ability to play soccer at a professional level.  These are financial interests sufficient to make the claims subject to immunity under Government Code section 822.2.

### 2. *Thomas Did Not Plead Facts Triggering the Corruption Exception.*

Thomas also argues Government Code section 822.2 immunity is not available to McGuire because she pleaded facts showing he was motivated by

---

[24]  Defendants describe *Peter W. v. San Francisco Unified School District* (1976) 60 Cal.App.3d 814, as holding that Government Code section 822.2 immunized school district employees from liability for misrepresentations that a student was performing at or near grade level, but the case does not include such a holding.  *Peter W.* held that the plaintiff, who was attempting to impose tort liability on the school district for failing to properly educate him, failed to state a claim for negligence or "*negligence* in the form of the 'misrepresentation' alleged" because policy considerations negated "an actionable 'duty of care' in persons and agencies who administer the academic phases of the public educational process." (*Peter W.,* at pp. 825, 827.)  The court then suggested a cause of action for intentional misrepresentation might be more successful due to the "judicial limitations placed upon the scope of the governmental immunity" under sections 818.8 and 822.2, but found the claim was not stated because no facts showing reliance were alleged.  (*Peter W.,* at p. 827.)

corruption, thus triggering the statutory exception to immunity where the public employee "is guilty of actual fraud, corruption or actual malice." (Gov. Code, § 822.2.)[25]  To come within this exception, "[i]n addition to facts establishing the ordinary elements of common law deceit, the pleader also must allege *facts* showing that the fraud was motivated by corruption or actual malice." (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 649.)  The plaintiff must connect the alleged corruption to the claimed harm; "[t]he mere existence of corruption or wrongdoing, unconnected to the alleged harm to [plaintiff], is insufficient. (*Id.* at p. 650.)

The corrupt motive Thomas attributes to McGuire relates to the "Varsity Blues" admission scandal that came to light in 2019[26]—as Thomas described it, the "national admissions scandal that was discovered to have exploited athletic teams at prestigious universities to enroll students who lacked the athletic skills to achieve enrollment to the universities as student athletes."  The allegations Thomas points to as showing corruption are that McGuire knew at the time he recruited her that he had "allowed women who were not qualified athletes to become part of the team, which would put [Thomas's] spot on the team in jeopardy"; that he failed to disclose Thomas could be removed from the team "for reasons beyond her failure to play competently and in accordance with his instructions and meet his standards of behavior"; and that the Auditor had concluded UCB "wrongfully admitted students using athletic teams as the point of entry" who "were not recruited

---

[25]  Thomas does not rely on the "actual fraud" or "actual malice" prongs of the exception to Government Code section 822.2. immunity.

[26]  See Taylor, *College Admissions Scandal*, New York Times (Oct. 8, 2021) <https://www.nytimes.com/news-event/college-admissions-scandal#:~:text=The%20federal%20investigation%2C%20known%20as,presti gious%20universities%20in%20the%20country> (as of Nov. 28, 2023).

for their athletics ability and some [of whom] did not even play on the teams for which they were purportedly recruited to play." Thomas's cause of action for fraud alleged that McGuire failed to disclose that he "would put the interests of unqualified student athletes or himself above her interests" and that he "intended to deceive" her when he advised her that she would remain on the team as long as she played competently, followed his instructions and met his standards of behavior, and "further deceived" her when he "failed to disclose that he would allow unqualified players to become members of the team and thereby jeopardize her own status as a team member."

The implication of these allegations is that McGuire was involved in the Varsity Blues admissions scandal and released Thomas from the team to make room for unqualified players admitted to UCB under the guise of playing for his team. But Thomas alleged no facts connecting McGuire to the scandal. The only such connection suggested by her allegations is based on the *suspicion* of a team member that two women who had been recruited to the team two years before but did not play were related to the scandal. Thomas argues her claims that McGuire "acted corruptly in failing to disclose to her how decisions regarding team membership would be made" were lent credence by the Auditor's 2020 report concluding that UCB had "wrongfully admitted students using athletic teams as the point of entry." But she did not allege that the Auditor's report implicated McGuire or the women's soccer team.

Nor did Thomas allege facts—as opposed to conclusory statements or supposition—showing that McGuire knew at the time he recruited her that she might be removed from the team for unjustified reasons or in order to serve the interests of unqualified players. Thomas does not explain how any involvement by McGuire in the improper admissions process related to his

recruitment of her or decision to release her from the team—that is, how such involvement would cause him to falsely represent during recruitment that Thomas would be able to play for UCB for four years. To the extent the allegations support an inference that McGuire failed to disclose that he might dismiss Thomas to make room on the team for an unqualified student improperly admitted to UCB as a soccer player, the inference is contradicted by Thomas's allegation that "there is no external limit on team size for the women's soccer team, so even under-performing players do not need to be released to create room for other, stronger performers." Thomas does not suggest any other way in which a connection to the admissions scandal might relate to McGuire's decision to release her from the team. In short, Thomas failed to connect the allegations she sees as demonstrating a corrupt motive to the harm she alleges—unjustified release from the team.

The trial court did not err in sustaining McGuire's demurrer based on his immunity under Government Code section 822.2.

## VI.

### *Negligent Misrepresentation*

Thomas contends the trial court erred in refusing to allow her to pursue the claim for negligent misrepresentation she alleged in the second amended complaint. She contends the claim should have been permitted because a complaint that pleads fraud necessarily also pleads negligent misrepresentation. (*Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 845 [complaint found to state cause of action for fraud necessarily states cause of action for negligent misrepresentation because both have same elements except that the latter does not require intent to induce reliance].) Thomas urges that adding a new claim against a defendant already party to the case should be permitted to

66

advance the "fundamental policy of our courts that cases should be decided on their merits." (*Hirsa v. Superior Court* (1981) 118 Cal.App.3d 486, 490.)

We need not address these issues. Since Government Code section 822.2 applies to both intentional and negligent misrepresentation, our conclusion that McGuire is entitled to immunity from liability for fraud necessarily means he is entitled to immunity from liability for negligent misrepresentation as well.

## DISPOSITION

With respect to the first cause of action of the first amended complaint against McGuire and UCB, the judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

In all other respects, the judgment is affirmed.

Each party shall bear its own costs.

_____
STEWART, P.J.


I concur.


_____
RICHMAN, J.


*Thomas v. Regents of the Univ. of California* (A164550)

MARKMAN, J., Concurring and Dissenting.

## I. Introduction

I respectfully dissent from part II.B.3 of the majority opinion regarding the sufficiency of Renee Thomas's pleading under Civil Code section 51.9 and from the disposition of that claim.[1]  Under section 51.9, subdivision (a)(2), Thomas must allege at least some factual basis that her soccer coach, Neil McGuire, "engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature *based on gender*, that were unwelcome and pervasive or severe."  (§ 51.9, subd. (a)(2), italics added.)  Thomas failed to do so in her first amended complaint.  She alleged bullying by McGuire, but section 51.9 is not an anti-bullying law *unless* the bullying is factually linked to gender.  Thomas did not allege facts from which anyone could conclude that the bullying she experienced was "based on gender." (*Ibid.*)

The trial court was too quick to sustain the Regents' demurrer without leave to amend.  Thomas did not get a meaningful opportunity to state a section 51.9 claim.  I would therefore reverse the judgment and grant Thomas leave to amend that cause of action.

## II. Analysis of Section 51.9

### A. Statutory Construction

" 'In construing a statute, our task is to ascertain the intent of the Legislature so as to effectuate the purpose of the enactment.' "  (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1120.)  "We look first to 'the words of the statute, which are the most reliable indications of the Legislature's intent.' "  (*Ibid.*)  " 'The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' "  (*Imperial Merchant*

---

[1]  Undesignated statutory references are to the Civil Code.

*Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387–388.) "We decline to insert any additional restrictions into an otherwise unambiguous provision." (*Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 85.) We construe the language of the statute "in its full statutory context, keeping in mind the nature and purposes of the statutory scheme as a whole." (*California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1087; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387.)

The plain language, purpose, and legislative history relating to section 51.9 all support a construction that requires a link between the wrongful act and the plaintiff's gender. The plain language of section 51.9, subdivision (a)(2) specifically requires that the verbal, visual, or physical conduct be "of a hostile nature based on gender."

As originally enacted in 1994, section 51.9 operated with a very limited definition of sexual harassment. It covered only "sexual advances, solicitations, sexual requests, or demands for sexual compliance by the plaintiff that were unwelcome and persistent or severe, continuing after a request by the plaintiff to stop." (Stats. 1994, ch. 710, § 2.)

In 1999, the Legislature enacted Assembly Bill No. 519 to conform section 51.9 to federal law. (See Governor's letter to Assem. on Assem. Bill No. 519 (Oct. 10, 1999) 3 Assem. J. (1999–2000 Reg. Sess.) p. 4578 ["I am supporting this legislation as it will bring the sexual harassment laws into conformity with other California sexual harassment prohibitions in the Government Code. In addition, this will conform California law to federal anti-sexual harassment laws"].) The Legislature expanded the definition of sexual harassment to also cover "other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were welcome and

2

pervasive or severe." (Stats. 1999, ch. 964, § 1.)[2] The Legislature thus re-grounded section 51.9 in the "conditions of the relationship and how the improper conduct affects those conditions." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 519 (1999–2000 Reg. Sess.) as amended Sept. 9, 1999, p. 4.)

Importantly, the legislative history of Assembly Bill No. 519 confirms that section 51.9 was not intended to become a generalized anti-bullying law. The original draft of the bill would have done so, by covering "other verbal, visual, or physical conduct of a sexual or hostile nature that were unwelcome and pervasive or severe." (Assem. Bill No. 519 (1999–2000 Reg. Sess.) as amended May 10, 1999, p. 97.) Senate amendments changed the language to require that the wrongful acts of a hostile nature be explicitly "based on gender." (Assem. Concurrence in Sen. Amends. to Assem. Bill No. 519 (1999–2000 Reg. Sess.) as amended Sept. 9, 1999, p. 2.) That is the language in the statute as it exists today.

## B. Case Law

Cases repeatedly warn against the use of sexual harassment laws to address other forms of misconduct without a nexus to gender. Based on guidance from the United States Supreme Court, courts have warned that sexual harassment claims are not intended to enforce a " 'general civility code' " or to broadly police workplace sensitivity. (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377 (*Jones*), quoting *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81

---

[2] The Legislature also eliminated the requirements that a victim ask the perpetrator to stop and that a section 51.9 complaint be verified, dispelling the traditional (but wrongful) higher burden on the sexual harassment plaintiff as compared with plaintiffs in other cases. (Stats. 1999, ch. 964, § 1; see maj. opn., *ante*, at p. 27, fn. 11.)

(*Oncale*).)[3] Even in more traditional sexual harassment cases involving hostile environment claims in the workplace (e.g., under Title VII and the Federal Employment and Housing Act (FEHA)), "annoying or 'merely offensive' comments in the workplace are not actionable." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283, quoting *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21.)

Cases also affirm the use of a demurrer as a back-stop against attempts to expand section 51.9 beyond its intended purpose. In *Ramirez v. Wong* (2010) 188 Cal.App.4th 1480 (*Ramirez*), for example, the appellate court affirmed an order sustaining a demurrer to a section 51.9 claim where the plaintiffs' allegations were conclusory, identifying "only one instance of allegedly harassing conduct" where their apartment resident manager "went into [plaintiffs'] bedroom, opened plaintiffs' dresser drawer and removed and

---

[3] The majority argues that this quotation from the unanimous 1998 United States Supreme Court opinion in *Oncale* sets up a "straw man" that "misses the point" and is "trivializing the allegations of plaintiffs and other women athletes who have been treated especially harshly by coaches in a manner perceived as based on their gender." (See maj. opn., *ante*, at p. 21, fn. 7.) The same quotation has appeared in over 2,100 cases in the intervening years (including in at least 12 California appellate decisions, three of which were precedential). Far from a straw man, *Oncale* cautions against the expansion of sexual harassment laws (Title VII of the federal Civil Rights Act of 1964 (Title VII) in that case) to include verbal and physical harassment that is not based on gender. (*Oncale*, *supra*, 523 U.S. at p. 80.) Speculative allegations regarding the coach's possible intent cannot simply be buttressed by adding similarly speculative allegations about the players' subjective perceptions of his conduct. Such an approach would both ignore the concern expressed in *Oncale* and create new law that, as a practical matter, would expose coaches of a different gender than their own players to potential liability under section 51.9 based exclusively on a player's perception of the coach's coaching. The bullying Thomas alleges in her amended complaint is not in any way trivial—it simply is not yet sufficient to state a section 51.9 claim.

sniffed plaintiffs' underwear, all without plaintiffs' permission or knowledge." (*Ramirez*, at pp. 1483, 1488.) Relying on *Hughes v. Pair* (2009) 46 Cal.4th 1035 (*Hughes*), the court explained that "To prevail on a hostile work environment claim, the plaintiff must show that the harassing conduct was ' "severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex." ' " (*Ramirez*, at p. 1487, quoting *Hughes*, at pp. 1043, 1048.)

The residence manager's " 'home invasion' " was profoundly troubling, but the court in *Ramirez* concluded the plaintiffs were "miss[ing] the point." (*Ramirez*, *supra*, 188 Cal.App.4th at p. 1487.) While the misconduct "may constitute burglary or other crimes, and may be a severe intrusion into plaintiffs' privacy . . . those facts cannot transform [the manager's] conduct into sexual harassment, which requires ' "a concerted pattern of harassment of a repeated, routine or a generalized nature" ' [citation] or, in the case of an isolated incident, ' "a *physical* assault or the threat thereof." ' " (*Id.* at pp. 1487–1488.)

Other cases are in accord. In *Hughes*, the leading case on section 51.9, the California Supreme Court concluded that the defendant's ominous statement to plaintiff—" 'I'll get you on your knees eventually' "—was a threat of financial retaliation, not physical violence, and therefore did not support a claim under section 51.9. (*Hughes*, *supra*, 46 Cal.4th at p. 1049.)

In *Jones*, a correctional officer sued her employer and alleged sexual harassment under FEHA. (*Jones*, *supra*, 152 Cal.App.4th at p. 1373.) The appellate court affirmed summary judgment because the officer had not presented evidence linking the alleged harassment to the officer's gender. (*Id.* at pp. 1377–1378.) It explained, "Specifically, Respondents, in their

5

moving papers, pointed to Jones's deposition testimony in which several times she was asked whether the comments and complaints her coworkers made about her were prompted by her gender or race. Jones repeatedly answered, 'No' and 'I don't know.' The absence of the nexus between the alleged harassment and Jones's gender negates her FEHA claim." (*Id.* at p. 1378.)

Enforcing the requirement of a factual nexus between the harassment and gender would not change the law or set an artificially high bar to filing sexual harassment claims. The most expansive of the hostile environment sexual harassment cases relied on by the majority include facts that link the alleged misconduct to gender. For example, in *Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, disputed evidence concerning a defendant's discriminatory intent barred summary judgment. (*Id.* at p. 1525.) But the case also included plenty of facts linking gender to the harassment that the plaintiff experienced. (*Id.* at p. 1527.) As the appellate court described the facts in that case: "Some of Hickman's alleged acts had sexual connotations. Lewis testified Hickman showed Lewis images on Hickman's office computer that included a video of a penis in a rat trap and an image of a woman with lopsided breasts. Hickman told Lewis 'risqué' jokes, including: ' "How do you make your wife moan then scream? You fuck her in the ass and then you wipe it on your drapes." ' " (*Ibid.*, fn. omitted.) The link between gender and harassment could hardly be more evident.

Similarly, the police officer plaintiff in *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341 (*Accardi*) unquestionably linked her harassment to her gender. That court described: "Upon reporting for duty, she was advised that male officers did not wish to have a female officer on patrol with them. She claims that, in the ensuing years, she was the object of discrimination

6

that took the form of threats, rejection, mockery, application of double standards, sexual advances, and intimidation." (*Id.* at p. 350.) Later, "she was excluded from certain light duty assignments that were given to injured male officers." (*Ibid.*)

In *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, Division Four of this court confirmed that, despite its important contributions to the law concerning hostile workplace sexual harassment, the *Accardi* decision maintained the requirement of a factual link between the alleged harassment and gender. (*Birschtein*, at p. 1002.) The defendant in *Birschtein* attempted to minimize concerns about his persistent staring at the plaintiff in the workplace. (*Id.* at pp. 997–998.) The appellate court identified evidence precluding summary judgment, including evidence linking the defendant's allegedly gender-neutral conduct—staring— and plaintiff's gender, because his "staring" had been preceded by gender-based misconduct. (*Id.* at pp. 1002, 1008.) It explained: "What began as [defendant's] overt acts of sexual harassment (asking for dates, the 'eat you' remarks, his specifically sexual bathing fantasies) were later transmuted by plaintiff's reaction (her complaints to management about the offensive conduct) into an allegedly daily series of *retaliatory* acts—the prolonged campaign of staring at plaintiff—acts that were directly related to, indeed assertedly *grew out of*, the antecedent unlawful harassment." (*Id.* at p. 1002.) The appellate court reasoned that the *Accardi* opinion had "put the matter convincingly when it characterized such a skein of harassment and complaint followed by retaliatory acts as a 'continuous manifestation of a *sex-based animus.*'" (*Birschtein*, at p. 1002, quoting *Accardi*, *supra*, 17 Cal.App.4th at p. 351.)

7

In short, even *Accardi* required that the alleged harassment be linked to gender. While proof at the summary judgment or trial stage might well depend on evidence concerning a defendant's discriminatory intent, the link between the hostile environment and gender at the pleading stage was plainly evident in these cases. The link between harassment and gender is crucial.

California's pleading rules do not allow us to turn a blind eye to the failure to allege facts showing a nexus between gender and the alleged misconduct based merely on speculation that discovery might reveal a defendant's secret intent to harass based on gender. There is no denying that the factual link between gender and misconduct is highly fact-specific. But even at the pleading stage, courts play a critical role in "filter[ing] out" complaints asserting harassment claims that allege only " 'ordinary tribulations . . . such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.' " (*Faragher v. City of Boca Raton* (1998) 524 U.S. 775, 788, quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law (1992) 175; *Ramirez, supra*, 188 Cal.App.4th at p. 1488; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 614 [affirming demurrer to FEHA sexual harassment and retaliation claims]; see also *Lyle v. Warner Brothers Television Productions, supra*, 38 Cal.4th at p. 291 [affirming summary judgment on hostile work environment claim]; *Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 145 [same].)

These cases focus not on a defendant's possible intent, but rather on the facts alleged concerning the defendant's objective misconduct and the subjective reactions of a plaintiff (and others) to that conduct under the reasonable woman standard (in cases involving a female plaintiff). (*Harris v.*

*Forklift Systems, Inc.*, *supra*, 510 U.S. at p. 23; see *Fisher v. San Pedro Peninsula Hospital*, *supra*, 214 Cal.App.3d at p. 610.) Allegations of harassment unsupported by such facts are legal conclusions, which we are not to consider. (See *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395 [we "take as true all properly pleaded material facts—but not conclusions of fact or law" when reviewing an order on demurrer]; see also *Ramirez*, *supra*, 188 Cal.App.4th at p. 1488.)

## III. Absence of Facts Linking Bullying to Gender in First Amended Complaint

Thomas's first amended complaint alleges bullying by McGuire. It alleges McGuire "behaved erratically and abusively towards his team in documented incidents since at least 2009." He "lost his temper at the young female athletes on many occasions." "In fits of rage, he singled out his athletes and berated them in front of the team, sometimes nonsensically, to make an example out of them and strike fear in the witnessing athletes." Thomas also alleges that McGuire misled her, causing her to think she would get more playing time and would be a central member of the team.

The first amended complaint, however, does not allege a nexus between the bullying and Thomas's gender. Thomas alleges that McGuire "called young female athletes names, cursed at them, and degraded them with personal insults both related and unrelated to athletic performance," "belittle[ed] and degrade[d]" Thomas, and "tormented the athletes psychologically," but the complaint fails to identify any name-calling or cursing, belittling, degrading, or psychological tormenting directed in any way at Thomas's gender.

When the first amended complaint does provide specifics, the facts have nothing to do with gender. For example, it alleges McGuire "berated Ms. Thomas for not being disciplined, despite her commitment at practices

9

and her initiative," and "tirades where [the coach] degraded the entire team." McGuire "tormented them psychologically and punished them with grueling workouts," but the first amended complaint does not link the torment or punishment to gender.

Thomas focuses on two allegations: that McGuire "called out the physique of one player in front of the team and called her weak despite her compliance with the training regimen" and "berated a young woman for having what he perceived as a hickey on her neck." But these allegations alone, without more, have no nexus with gender.

References in Thomas's complaint indicate that it might be possible for her to allege the necessary link. For example, the first amended complaint refers to a letter that "documented the abuses suffered" by other team members. In a different paragraph, the amended complaint indicates a December 2019 report from the Office for the Prevention of Harassment and Discrimination of a complaint by an employee about McGuire that "confirmed" his "inappropriate comments about young women's bodies and about 'hickeys' on the young women's necks." Facts linking these comments about bodies to gender, rather than to an athlete's strength and athleticism in the abstract, if pervasive, could supply the missing nexus between McGuire's alleged bullying and gender. It may also be possible for Thomas to allege the coach's use of gender-degrading names, comments directed at embarrassing a female based on body type, or tirades about gender orientation.

The majority suggests that the allegations in the first amended complaint are sufficient and they "may cast light on unexpressed implications in or motives for other more gender-neutral harassment." But without any allegations that the alleged hostile conduct was based on gender, we ought

10

not speculate about the intent behind McGuire's alleged bullying. "[T]he defendant's discriminatory mental state is crucial" to establishing a claim based on hostile environment harassment. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 115.) Here, however, the first amended complaint contains *no* factual allegations regarding McGuire's "discriminatory mental state" (despite the representation at oral argument that Thomas had the opportunity to take McGuire's deposition while the Regents' various motions to dismiss and demurrers have been pending). The closest it comes is a pure legal conclusion that reads simply: "A substantial motivating reason for defendants' . . . conduct was Ms. Thomas's gender."

In sum, mere speculation about a nexus between the hostile acts and gender is not enough. (Cf. *E.E.O.C. v. National Educ. Ass'n, Alaska* (9th Cir. 2005) 422 F.3d 840, 842 [employees of a teachers' union survived summary judgment by presenting "sufficient circumstantial evidence of qualitative and quantitative differences in the harassment suffered by female and male employees"].) Establishing the nexus between bullying and gender requires alleging more than that the bullying took place in the context of a gender-specific sports team and so all bullying is necessarily linked to gender. Based solely on existing California law, and without importing heightened pleading requirements imposed by the federal courts, the trial court was correct in sustaining the demurrer.

## IV.  Leave to Amend

Taken at face value, the first amended complaint did not attempt to state a claim under section 51.9. It labeled Thomas's claim as one under the Unruh Act. Thomas should have been given a chance to articulate a theory under section 51.9 rather than under the Unruh Act. Had Thomas focused on stating a claim under section 51.9, there is at least "a reasonable possibility

11

that the defect can be cured by amendment," and so "the trial court has abused its discretion" and we should reverse with leave to amend. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

The trial court focused on the fact that Thomas had already filed multiple complaints in two lawsuits alleging various theories of sexual harassment relating to a gender-based hostile work environment, and sought reconsideration of an order concerning one of the federal pleadings. Her only attempt to articulate a theory under section 51.9, however, was in her opposition to the Regents' demurrer, where she told the trial court that she thought she would have "a viable cause of action" based on that statute.

Rather than give her a chance to articulate a claim under section 51.9, the trial court found that the federal court had "evaluated the same allegations" and thus, if Thomas had attempted to "specifically allege a section 51.9 claim," the attempt "would fail." But the federal court was evaluating a slightly different set of claims under a different pleading standard. (See maj. opn., *ante*, at p. 28, fn. 12.) The language of section 51.9 is similar to federal sexual harassment statutes and to provisions in the FEHA, but it is not identical. The trial court should have granted Thomas leave to amend her first amended complaint to attempt to state a claim under section 51.9.

## V. Conclusion

A sexual harassment claim under section 51.9 based on a hostile environment theory requires that a plaintiff allege a factual nexus between the acts creating a hostile environment and gender. Thomas's need to amend therefore goes beyond merely rearticulating that section 51.9 is the statutory basis of her claim rather than the Unruh Act. I would conclude that Thomas

12

has not yet met the statute's requirements but would give her the opportunity to do so.


_____

MARKMAN, J.*

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:      Alameda County Superior Court

Trial Judge:      Hon. Richard Seabolt

Counsel:

Siegel, Yee, Brunner, & Mehta, Dan Siegel and EmilyRose Johns for Plaintiff and Appellant.

Venable, Jean-Paul P. Cart and Amit Rana for Defendants and Respondents.